398 N.W.2d 91 (1986)
224 Neb. 249
In re Interest of L.D., Z.D., N.D., and D.D., Children Under 18 Years of Age.
Robert E. WHEELER, Guardian Ad Litem, Appellant, State of Nebraska, Appellee and Cross-Appellee,
v.
D.D., Appellee and Cross-Appellant, and S.D., Appellee.
No. 86-310.
Supreme Court of Nebraska.
December 19, 1986.
*93 Robert E. Wheeler, Ord, guardian ad litem, for appellant.
Curtis A. Sikyta, Ord, for appellee D.D.
KRIVOSHA, C.J., and BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.
SHANAHAN, Justice.
As authorized by the Nebraska Juvenile Code, Neb.Rev.Stat. §§ 43-245 to 43-2, 129 (Reissue 1984), on August 7, 1984, the county attorney of Garfield County, in his signed but unverified petition in the county court as a juvenile court, alleged that certain juveniles, that is, L.D. (7 years), Z.D. (6 years), N.D. (4 years), and D.J.D. (19 months), were "subject to the jurisdiction of this Court under Section 43-247(3)(a) and are currently in a situation injurious to the health and/or morals" of the named juveniles.
Section 43-247 states in part:
The juvenile court in each county as herein provided shall have jurisdiction of:
(1) Any juvenile who has committed an act other than a traffic offense which would constitute a misdemeanor or an infraction under the laws of this state, or violation of a city or village ordinance;
(2) Any juvenile who has committed an act which would constitute a felony under the laws of this state;
(3) Any juvenile (a) who is homeless or destitute, or without proper support through no fault of his or her parent, guardian, or custodian; who is abandoned by his or her parent, guardian, or custodian; who lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian; whose parent, guardian, or custodian neglects or refuses to provide proper or necessary subsistence, education, or other care necessary for the health, morals, or well-being of such juvenile; whose parent, guardian, or custodian neglects or refuses to provide special care made necessary by the mental condition of the juvenile; or who is in a situation or engages in an occupation dangerous to life or limb or injurious to the health or morals of such juvenile or (b) who, by reason of being wayward or habitually disobedient, is uncontrolled by his or her parent, guardian, or custodian; who deports himself or herself so as to injure or endanger seriously the morals or health of himself, herself, or others; or who is habitually truant from home or school;

*94 (4) Any juvenile who has committed an act which would constitute a traffic offense as defined in section 43-245.
Because we must determine the exact nature of certain actions taken by the juvenile court in this case, we examine and analyze the circumstances under which the juvenile court acted.
After the petition had been filed, on August 7 the children's parents, the father's attorney, and the county attorney attended a hearing in the juvenile court, where the father "submitted to the jurisdiction of the Court, admitting the need for Court intervention, but specifically not admitting any specific allegations or facts underlying the Petition." The court then appointed a guardian ad litem for all the children and an attorney for the father, but deferred appointment of counsel for the mother. The father filed a motion on August 31, requesting, among other items, visitation rights with his children. On September 25 the county attorney, the guardian ad litem, and the court-appointed counsel for the father appeared before the juvenile court, which ordered that psychological evaluations of all parties be completed within 45 days and the father's visitation of the children be supervised by the Department of Social Services. Although the father had never filed any pleading responsive to the petition, the father's attorney sought depositions from prospective witnesses.
Immediately before adduction of evidence at a hearing on April 30, 1985, the father's counsel expressed concern about safeguarding the father's privilege against self-incrimination and the possibility of criminal charges against the father for his acts involving the children. Regarding the hearing about to take place, counsel for the father stated: "[W]e need to back up and give [the father] a right to protect himself from the very beginning rather than going into dispositiongoing into these things on disposition." To expedite the pending proceedings in the juvenile court, the State expressed a willingness to extend immunity to the father. The guardian ad litem remarked: "The whole issue is one of sexual abuse. If [the father] will not admit to the sexual abuse then I think the Court must make a determination of whether there was, otherwise we get rid of the case." Counsel for the mother commented that the hearing became necessary, since the father had denied any misconduct, and, therefore, the father's sexual abuse of his children had to be "proved to the satisfaction of the Court." In the presence of the parents, their lawyers, and the guardian ad litem, evidence was then adduced at the April 30 hearing before the juvenile court.
Nadine Folken, an employee of the Department of Social Services for the State of Nebraska, testified that she, in response to a report that the father had sexually abused his children, visited with the children, who described their sexual contacts with their father. One male child told Ms. Folken that his father had fondled the boy's genitals and, further, as the boy pointed to his genital area, informed Ms. Folken that "sometimes daddy hurts me." Another male child recounted to Ms. Folken an incident of sexual contact with his father and his father's semen. (We decline any further detailed elaboration of this particular incident.)
Dr. Thomas England, a clinical psychologist, testified concerning his interviews of the children in the fall of 1984. Two of the male children discussed incidents involving their father's fondling their genitals and his ejaculation in response to their "touching" him. Dr. England testified concerning the characteristics of a male individual involved in "incest or sexual molestation" and that he found such characteristics present in the father of the children. Dr. England concluded that there had been "sexual contact between [the father] and the children." Finally, Dr. England recommended that any visitation of the children by the father be supervised and that there should be counseling for "all parties."
One of the State's witnesses, a female first cousin of the children's father, testified that approximately 6 years before the hearing, when that witness was 13 years of *95 age, the father of the children had "sexual intercourse" with the witness.
Called as a witness by the State, the children's father, age 34, denied all sexual "incidents" with his children. The children's parents were divorced at the time of the hearing. The father did acknowledge that, when he was 12 years old, he had "closeness and simulation of sex but no penetration" of his 8-year-old sister. The father persisted in such relationship with his sister for a period in excess of 12 months. Also, the father admitted a "flashing" incident which had been publicly observed in the parking lot of a Grand Island mall in the fall of 1982, where the father performed a sexual act on himself "to relieve [his] tension." Later, after confrontation by the Grand Island police, who stated that "prosecution would be imminent if [he] did not take and get counseling and psychiatric evaluation," the father obtained psychiatric help.
Another psychologist, Dr. John Curran, testified for the State. Dr. Curran had interviewed L.D., Z.D., N.D., and their mother. As testified by Dr. Curran, the father had "little control over sexual impulses," one of the characteristics of "an abusing parent." Referring to the children's father and his relationship with his sister, Dr. Curran characterized that relationship "as a sexual abuse relationship; a predatory relationship." Dr. Curran pointed out two aspects of sexual abuse which indicate a chronic condition in an abuser: first, sexual abuse is highly rewarding to the abuser; and, second, sexual abuse usually is immediately rewarding to the abuser. In reference to the father in this case, and evaluating him in terms of those two aspects of the chronic sexual abuser, Dr. Curran concluded: "I would believe that [the father] is at risk for committing sexual abuse in the future, and I think that his children would likely be targets." Dr. Curran also testified that sexually abused children "start postulating that they were somehow responsible for these acts. Some of that leads to them thinking they are dirty, not worthwhile, and that thethis leads into further problems." As noted by Dr. Curran, immediate damage from sexual abuse to children includes distrust of adults, bed-wetting, and an excessive fear of being alone in the bathroom. Dr. Curran further testified regarding "long term damage characteristics" of sexually abused children, namely, a difficulty in formation of sound relationships with others, inappropriate sexual behavior, running away from home, and chronic depression. Finally, Dr. Curran concluded that there had been "sexual abuse perpetrated upon [L.D.] by his father."
The children's mother testified that the children were elated when they learned that "daddy wouldn't be gettin' in bed" with them any more.
During the hearing on April 30, counsel for the father made several objections, including objections regarding hearsay, irrelevant evidence, testimony lacking foundation, leading questions, argumentative questions, and competency of witnesses; requested that certain evidence be stricken; stipulated to the qualifications of Drs. England and Curran as expert witnesses; called the court's attention to repetitious questions; and requested a ruling by the court when it appeared that the court had deferred ruling on or overlooked objections made by the father's counsel.
At conclusion of the evidence adduced at the April 30 hearing, the court remarked: "[B]efore we can order any counseling we've got to orderwe've got to find sexual abuse otherwise we've got to just dismiss it [the petition and proceedings]." The court took the matter under advisement and, on May 6, "after carefully considering the evidence," found "there has been some evidence of sex abuse" and ordered that the father be permitted to visit his children, subject to supervision from the Department of Social Services. The court further ordered that the father "shall receive counselling for sex abuse, and that such supervision and counselling shall gradually diminish as the situation improves [and] that this matter shall be reviewed at the end of 3 months."
On May 9 the father filed a motion requesting clarification of the kind of counseling *96 ordered by the court and specification of the "type of visitation" he might exercise regarding his children. In August the father filed another motion, informing the court about the unavailability of a psychologist for counseling and requesting a review as soon as possible.
There was never another hearing until October 18, when the court, on its own "Motion for Review Hearing" and without reception of additional evidence, found that "at the April 30, 1985 Dispositional Hearing, there was insufficient evidence to show sexual abuse and the matter is therefore dismissed."
The guardian ad litem, in his appeal to the district court, presented two contentions. First, the guardian ad litem alleged that, as a result of the adjudication hearing on April 30 and as reflected in the order of May 6, the juvenile court found that the father had sexually abused his children. Second, the guardian ad litem contended that, in view of the order of May 6, which was based on the evidence adduced at the April 30 hearing, the juvenile court improperly ordered the case dismissed on October 18.
In reaching its decision, the district court found two statutes were controlling, namely:
The county attorney or any reputable person residing in the county, with the consent of the county attorney, having knowledge of a juvenile in his or her county who appears to be a juvenile described in subdivision (1), (2), (3), or (4) of section 43-247 may file with the clerk of the court having jurisdiction in the matter, a petition in writing specifying which subdivision of section 43-247 is alleged and setting forth the facts verified by affidavit. Allegations under subdivisions (1), (2), and (4) of section 43-247 shall be made with the same specificity as a criminal complaint. It shall be sufficient if the affidavit is based upon information and belief....
§ 43-274; and:
Except when the care of the juvenile is awarded to the Department of Social Services, together with termination of parental rights, or the juvenile has been legally adopted, the jurisdiction of the court shall continue over any juvenile brought before the court, or committed under the provisions of sections 43-245 to 43-2, 129, and the court shall have power to order a change in the custody or care of any such juvenile, if at any time it is made to appear to the court that it would be for the best interests of the juvenile to make such change.
§ 43-295.
According to the district court, the county attorney's unverified petition prevented the juvenile court's acquisition of jurisdiction, and § 43-295 authorized the juvenile court to change its May 6 order. For those reasons the district court affirmed the October 18 order of the juvenile court, that is, dismissal of the proceedings, entered an order on costs, and awarded a fee of $200 to the guardian ad litem and to the court-appointed counsel for the father.
On appeal to this court the guardian ad litem contends (1) notwithstanding the unverified petition in the proceedings, the juvenile court adjudicated that the children were juveniles within the Nebraska Juvenile Code as the result of their father's sexual abuse of the children, and (2) the October 18 order of the juvenile court, vacating the order of May 6, is not authorized by law. The father has cross-appealed, claiming the district court erred in the amount allowed as an attorney fee for the services of the father's court-appointed counsel in the appeal to the district court.
We now cut the gordian knot binding the case before us.
First, we examine the district court's decision that, as the result of the unverified petition, the juvenile court never acquired jurisdiction. If the district court is correct in its decision that the juvenile court lacked jurisdiction for the hearing of April 30 and the order of May 6, the district court's further finding that the juvenile court was *97 authorized to vacate its previous order is gratuitous.
"Litigants cannot confer subject matter jurisdiction on a judicial tribunal by either acquiescence or consent." Coffelt v. City of Omaha, 223 Neb. 108, 110, 388 N.W.2d 467, 469 (1986). See, also, Riedy v. Riedy, 222 Neb. 310, 383 N.W.2d 742 (1986). "Whether a question is raised by the parties concerning jurisdiction of the lower court or tribunal, it is not only within the power but the duty of an appellate court to determine whether such appellate court has jurisdiction over the subject matter." Glup v. City of Omaha, 222 Neb. 355, 359, 383 N.W.2d 773, 777 (1986). "Where lack of subject matter jurisdiction in the original tribunal is apparent on the face of the record, yet the parties fail to raise that issue, it is the duty of the reviewing court to raise and determine the issue of jurisdiction sua sponte." Id. Regarding the unverified petition in the juvenile court, the district court apparently applied the preceding principles regarding jurisdiction, as enunciated in Coffelt, Riedy, and Glup, inasmuch as the father has never objected to the form of the petition, that is, absence of verification.
As expressed in § 43-247: "The juvenile court in each county as herein provided shall have jurisdiction of" any juvenile involved in the specific situations described in that statute. The Nebraska Juvenile Code further provides: "[The Nebraska Juvenile Code] shall be liberally construed to the end that its purpose may be carried out as provided in section 43-246." § 43-2,128. Hence, the Nebraska Juvenile Code must be liberally construed to accomplish its purposes serving the best interests of juveniles within the act. See, Healey v. Johnson, 188 Neb. 677, 198 N.W.2d 466 (1972); State v. Randall, 187 Neb. 64, 187 N.W.2d 586 (1971).
As a part of the Nebraska Juvenile Code, § 43-246 provides:
Acknowledging the responsibility of the juvenile court to act to preserve the public peace and security, [the Nebraska Juvenile Code] shall be construed to effectuate the following:
(1) To assure the rights of all juveniles to care and protection and a stable living environment and to development of their capacities for a healthy personality, physical well-being, and useful citizenship and to protect the public interest....
Although an adjudication under subsections (1), (2), (3)(b), and (4) of § 43-247, must be based on "proof beyond a reasonable doubt," an adjudication under subsection (3)(a) of § 43-247 is based on "a preponderance of the evidence." § 43-279(2).
We note that § 43-279 (Cum.Supp.1986), which became effective on September 6, 1985, now requires all adjudications under § 43-247 except an adjudication involving subsection (3)(a) to be "based upon proof beyond a reasonable doubt." We further note that § 43-279.01 (Cum.Supp.1986), which governs an adjudication under subsection (3)(a) of § 43-247 and also became effective on September 6, 1985, no longer indicates applicable rules of evidence but does retain the requirement that proof be "by a preponderance of the evidence."
Thus, the quantitative proof required for an adjudication based on subsection (3)(a) of § 43-247, as alleged in the present case, is a "preponderance of the evidence" and, therefore, is analogous to the standard of proof generally applicable in civil cases. In contrast, an adjudication under subsections (1), (2), (3)(b), and (4) of § 43-247 is based on "proof beyond a reasonable doubt" and in that regard is akin to cases brought under the Nebraska Criminal Code or other statutes specifying a criminal offense. An explanation for those different evidential requirements may be the particular conduct examined by a juvenile court, that is, subsections (1), (2), (3)(b), and (4) of § 43-247 relate to a juvenile's misconduct, whereas subsection (3)(a) of § 43-247 pertains to another's conduct inflicted upon or directed toward a juvenile. Also, conduct as a basis for terminating parental rights, see § 43-292, must be established by "clear and convincing evidence." In re Interest of L.J., J.J., and *98 J.N.J., 220 Neb. 102, 107, 368 N.W.2d 474, 479 (1985). However, in the case before us the State did not seek termination of parental rights, and the quantum of proof, as will develop in our opinion, is not an issue. Nevertheless, we find that an adjudication based on subsection (3)(a) of § 43-247 is analogous to a civil proceeding, which guides us in answering some of the questions presented in the case now under consideration.
Section 43-279(3) provides:
If the court shall find that the juvenile named in the petition is not within the provisions of section 43-247 it shall dismiss the case. If the court finds that the juvenile named in the petition is such a juvenile, it shall make and enter its findings and adjudication accordingly, designating which subdivision or subdivisions of section 43-247 such juvenile is within; the court shall then proceed to an inquiry into the proper disposition to be made of such juvenile.
We arrive, then, at one of the questions raised in this appeal: Is verification of a petition necessary to vest jurisdiction in a juvenile court for an adjudication pursuant to § 43-247(3)(a)? A petition, as a pleading, is a plaintiff's or claimant's written statement of fact which invokes the jurisdiction of a court, sets out a cause of action, and seeks relief. See, Paxton v. State, 59 Neb. 460, 81 N.W. 383 (1899); Brown v. Peters, 127 Tex. 300, 94 S.W.2d 129 (1936); Warren v. Roberts, Judge, 144 W.Va. 741, 110 S.E.2d 909 (1959). Nebraska's civil procedure previously required verification of pleadings. See Neb.Rev.Stat. § 25-824 (1943): "Every pleading of fact must be verified by the affidavit of the party, his agent, or attorney." In 1969 the requirement of verified pleadings in civil cases was eliminated. See § 25-824 (Cum.Supp.1969). Verification of a pleading, such as the petition in the case before us, constitutes no part of a pleading and, ordinarily, is not necessary to vest jurisdiction in a court. See, Johnson v. Jones, 2 Neb. 126 (1873); Dorrington v. Meyer, 8 Neb. 211 (1879); Northup v. Bathrick, 80 Neb. 36, 113 N.W. 808 (1907) (syllabus of the court) ("The verification of a pleading is not jurisdictional"); In re Estate of Shaffer, 203 Kan. 264, 454 P.2d 1 (1969); Chandler v. Taylor, 234 Iowa 287, 12 N.W.2d 590 (1944); United Farm Workers v. Agr. Labor Relations, 37 Cal.3d 912, 694 P.2d 138, 210 Cal.Rptr. 453 (1985).
As expressed in Preparatory Temple, etc. v. Seery, 81 N.J.Super. 429, 433, 195 A.2d 900, 903 (1963): "[Verification] is a purely procedural direction which is formal but does not go to the essence of the law with regard to requirements for jurisdiction of the courts." Also, as any other formal matter, an absence of, or defect in, verification is waived by failure to make a proper and timely objection. See, Woods v. Woods, 177 Neb. 542, 542-43, 129 N.W.2d 519, 521 (1964) ("pleading over waived any objection as to verification"); Emery v. Bennett, 97 Kan. 490, 155 P. 1075 (1916); Hite v. Reynolds, 163 Ky. 502, 173 S.W. 1108 (1915); 61A Am.Jur.2d Pleading § 349 (1981). In the case before us the father participated in proceedings and requested affirmative relief in an action commenced by the petition he now assails. If there were any deficiency of formalities in that petition, the father has waived his right to question any formal matters pertaining to that petition. Having considered some of the purposes of the Nebraska Juvenile Code and the construction to be given that act, we, therefore, hold that verification of a petition alleging a child to be a juvenile within § 43-247(3)(a) is not required to vest jurisdiction in a juvenile court. Nevertheless, it is the adjudication that a child is a juvenile, as characterized in § 43-247, which vests subject matter jurisdiction in a juvenile court, not the petition by which an adjudication is requested in proceedings before a juvenile court.
Before addressing the propriety of the juvenile court's order entered on October 18, 1985, we must determine the nature of the hearing on April 30 and the order of May 6 in these proceedings. The father, on realizing he was about to enter a *99 judicial evaluation of his conduct toward his children, asserted his right "to protect himself from the very beginning rather than going into dispositiongoing into these things on disposition." Such assertion by the father was obviously prompted by § 43-283, which provides: "Strict rules of evidence shall not be applied at any dispositional hearing." The manner in which evidence was presented to the juvenile court establishes that the hearing of April 30 was conducted under or governed by the "customary rules of evidence," see § 43-279(1), that is, adduction of evidence at the April 30 hearing was controlled by the Nebraska Evidence Rules, Neb.Rev.Stat. §§ 27-101 to 27-1103 (Reissue 1985). Clearly, the father wanted evidence at the April 30 hearing to be controlled by the Nebraska Evidence Rules rather than await a dispositional hearing, where evidence admitted under less stringent rules might make his rebuttal to the petition extremely difficult, if not impossible. When we take into account the remarks, statements, and comments by the parties immediately before the hearing of April 30, and when we consider the juvenile court's expression about the hearing, namely, "we've got to find sexual abuse otherwise we've got to just dismiss" the case, we can reach but one conclusion: The hearing on April 30 was intended to be, and was, an adjudication based on the father's conduct toward his children, or, more precisely, a determination whether the father had sexually abused his children. According to the petition filed in this case, the only subdivision of § 43-247 pertinent to the proceedings was (3)(a), that is, the children were in a situation which was "injurious to the health or morals" of those children. On May 6, after the juvenile court had found evidence of the father's sexual abuse of his children, the court did not dismiss the petition, see § 43-279(3), and, therefore, did adjudicate, albeit implicitly, that the father's misconduct brought the children within the purview of § 43-247(3)(a) as juveniles who were in a situation "injurious to the health or morals" of those juveniles. Thus, the order entered by the juvenile court on May 6, 1985, based on the evidence presented at the hearing of April 30, was an adjudication that the children were juveniles within the Nebraska Juvenile Code and that, therefore, the court had subject matter jurisdiction. An adjudication under § 43-247 of the Nebraska Juvenile Code is an appealable order. See, In re Interest of V.T. and L.T., 220 Neb. 256, 369 N.W.2d 94 (1985); In re Interest of Aufenkamp, 214 Neb. 297, 333 N.W.2d 681 (1983); State ex rel. Casselman v. Macken, 194 Neb. 806, 235 N.W.2d 867 (1975).
We now address the issue of the propriety of the juvenile court's order entered on October 18, 1985, setting aside the adjudication made on May 6.
Neb.Rev.Stat. § 24-541.02 (Reissue 1985), pertaining to appeals from proceedings in the county court sitting as a juvenile court, provides in part: "(1) In order to perfect an appeal from the county court the appealing party shall within thirty days after the rendition of the judgment or making of the final order complained of [statutory requirements omitted]."
If a lower court does not have subject matter jurisdiction and, therefore, has no power to entertain the proceedings or decide a question, an appellate court lacks jurisdiction to review or evaluate an evidentiary determination for an act outside the jurisdiction of the court whose judgment or order is appealed. See Glup v. City of Omaha, 222 Neb. 355, 383 N.W.2d 773 (1986). However, although an extrajurisdictional act of a lower court cannot vest the appellate court with jurisdiction to review or evaluate an evidentiary determination involved in such act, an appellate court has jurisdiction and, moreover, the duty to determine whether the lower court had the power to enter the judgment or final order sought to be reviewed. See Glup v. City of Omaha, supra.
No one appealed the juvenile court's order entered on May 6. In the absence of an appeal pursuant to § 24-541.02, the adjudication of May 6 became, *100 and is, a final order, due to the expiration of 30 days from rendition of that judgment and entry of such order. It is true that § 43-295 does allow a juvenile court to alter its previous order concerning "custody or care" of a juvenile. Section 43-295 is a statutory analog to Neb.Rev.Stat. § 42-351(1) (Reissue 1984) authorizing a district court's continuing jurisdiction involving "the custody and support of minor children" affected by proceedings for dissolution of a marriage. Cf. Nimmer v. Nimmer, 203 Neb. 503, 505, 279 N.W.2d 156, 158 (1979): "The decree of a District Court in an action for the dissolution of a marriage, insofar as minor children are concerned, is never final in the sense it cannot be changed. [Citation omitted.] Thus the court has continuing jurisdiction." Cf., also, Nemec v. Nemec, 219 Neb. 891, 367 N.W.2d 705 (1985). However, in the case before us, after an apparent reevaluation of the evidence underlying its May 6 judgment and order, which had become final, the juvenile court, on October 18, vacated its previous order and judgment because "there was insufficient evidence to show sexual abuse." Section 43-295 does not empower a juvenile court to review the evidentiary basis of its order which has become final as an adjudication of subject matter jurisdiction made under § 43-247. Under the circumstances of this case, the juvenile court lacked subject matter jurisdiction for its order of October 18, 1985, vacating the May 6 adjudication that the children were juveniles within the meaning of the Nebraska Juvenile Code. As a consequence of the juvenile court's lack of jurisdiction for its October 18 order, the district court had no jurisdiction to review any evidentiary determination made by the juvenile court without jurisdiction and should have set aside the juvenile court's order of October 18, which had dismissed the petition and proceedings brought by the county attorney. The district court committed error in failing to set aside the juvenile court's order of October 18, 1985.
Further, because the juvenile court's act setting aside its previous adjudication and final order of May 6 was beyond or outside the power of that court, the district court was without jurisdiction to enter an order awarding any fee for proceedings before the district court. Awarding a fee on account of the district court proceedings would be approbation and enforcement of the juvenile court's action taken without jurisdiction. As far as shown by the record presented to us, the juvenile court still has jurisdiction for further proceedings consistent with the Nebraska Juvenile Code, and the matter of fees and costs may be considered by the juvenile court. The district court lacked jurisdiction to enter its order on fees and costs and, therefore, committed error in making such order.
Before remanding this matter to the district court, we are compelled to make certain observations about the proceedings in the juvenile court. We remind the juvenile court and counsel that this case involves impressionable children in their formative years, not impersonal flotsam and jetsam adrift on a sea of indecision or, much worse, societal insensitivity or apathy. According to the court stenographer's certificates, the proceedings in the juvenile court consist of 80,750 words. There is one additional word which characterizes what has happened to the children in this case. However, judicial restraint precludes use of that word. As noted by the district court, the fees and costs thus far incurred in the juvenile court exceed $19,000, but that sum does not begin to approach the price being paid by the children, languishing during labyrinthine litigation in the juvenile court while they await a dispositional determination of their best interests.
Recognizing that this case has been pending in the juvenile court since August 7, 1984, we make statements which cannot be misunderstood regarding further proceedings in this matter. On remand the district court shall vacate and set aside the juvenile court's order and judgment entered on October 18, 1985, thereby reinstating not only the order and judgment entered by the juvenile court on May 6, 1985, but all other unappealed orders reflected *101 by the record brought to us in this appeal, as well. The district court is further directed to remand the matter to the juvenile court with directions to order the juvenile court to hold a dispositional hearing forthwith. At such dispositional hearing there shall be no relitigation, or attempted relitigation, of any question whether there has been misconduct on the part of the father toward his children. Existence of the father's misconduct toward his children has been established, and any attempt to retry that issue shall meet with extreme disapproval by this court.
Consequently, we reverse the district court's judgment affirming the juvenile court's order and judgment of October 18, which had vacated and set aside the juvenile court's adjudication made and order entered on May 6, 1985, and we remand this matter to the district court with direction to vacate and set aside the order entered in the juvenile court on October 18, 1985, and remand the matter to the juvenile court with directions to hold a dispositional hearing forthwith.
The judgment of the district court is reversed, and this matter is remanded with direction.
REVERSED AND REMANDED WITH DIRECTION.