IN RE INTEREST OF R.G., A CHILD UNDER 18 YEARS OF AGE. STATE OF NEBRASKA, APPELLEE, V. L.G.P., APPELLANT.

470 N.W.2d 780

Filed June 14, 1991.    No. 90-942.

Connie Kearney for appellant.

James S. Jansen, Douglas County Attorney, and Elizabeth G. Crnkovich for appellee.

Regina T. Makaitis, Assistant Douglas County Public Defender, guardian ad litem.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

## I. INTRODUCTION

Finding that pending investigation the temporary placement of the infant girl, R.G., was a matter of immediate and urgent necessity, the juvenile court, on August 10, 1990, ordered, ex parte, that the Nebraska Department of Social Services take custody of the infant but that custody be returned to her parents unless, within "eight judicial days," a petition was filed requesting continued detention. Seven calendar days

(presumably five judicial days) later, on August 17, 1990, the State of Nebraska filed a petition seeking further orders concerning the infant's custody. Following a hearing on August 24, 1990, at which the appellant mother, L.G.P., appeared, the juvenile court, on August 27, 1990, ordered that the infant's custody be continued in the department. The mother, and she only, has undertaken an appeal of both orders, claiming, in summary, that the juvenile court (1) erred in asserting jurisdiction because of myriad alleged federal and state constitutional violations in connection with both orders, as well as violations of state statutes in the entry of the ex parte order, (2) erred in its evidential rulings, (3) erred in permitting the participation of the infant's guardian ad litem in prosecuting the State's petition, and (4) erred in ordering that, pending an adjudication hearing, temporary custody of the infant remain in the department. The State claims we lack jurisdiction to consider this appeal, as the orders involved are not final. We conclude this court has jurisdiction as a result of the detention order of August 27, and affirm.

## II. PRACTICE CAUTION

Before proceeding further, we call attention to the fact that all bills of exceptions filed in this court, from whatever tribunal, are to conform to the requirements of the rules hereinafter cited. These rules dictate, among other things, that the full name of each witness and the nature of the examination undergone be stated at the top of each page of the witness' testimony. Neb. Ct. R. of Prac. 5F(3) and I (rev. 1989) and Neb. Ct. R. of Official Ct. Rptrs. 19f(3) and i (rev. 1989). The tops of the pages of the document filed as the bill of exceptions in this case reflect neither the name of the witness nor the type of examination involved.

We once again caution that a document entitled "bill of exceptions," but which is not prepared in accordance with our rules, is not such a bill and that the filing of an improperly prepared document in the nature of a bill of exceptions may result in a case being treated as if no bill had been filed. *Langness v. "O" Street Carpet Shop*, 217 Neb. 569, 353 N.W.2d 709 (1984). The fact that in order to properly review this case we

have taken the time to continually flip back and forth through the relatively short record of the August 24 hearing is not to be taken as an indication that we shall undertake the same task in future cases.

It also may be worth recalling that a court reporter's breach of duty may give rise to civil liability. *State v. Bradley*, 236 Neb. 371, 461 N.W.2d 524 (1990).

### III. FACTS

The record does not reflect what information, if any, the juvenile court had before it when it entered the ex parte temporary detention order of August 10. The August 17 petition leading to the August 24 hearing and subsequent August 27 detention order alleges that pursuant to the provisions of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1988), the juvenile court has jurisdiction over the infant because she lacked proper parental care by reason of the faults or habits of the mother. More specifically, it alleges that on three occasions since May 1990, the infant had been observed to have black eyes, which occurred while she was under the mother's care and custody, and that the mother continued to use alcohol and drugs to the extent that her parenting abilities were impaired.

Although the record does not reflect when the mother first received summons in these proceedings, which involve only the infant, the evidence adduced at the August 24 hearing establishes that the infant is the youngest of four children born to the mother and that she visited her children, all of whom appear to be in the department's custody, between August 10 and 24. The evidence further reflects that on the morning of the day on which the ex parte temporary detention order was issued, the mother, who is single, took her then 1-year-10-month-old daughter and the then 9-month-old infant to a day-care facility. In her absence she left her son, then 8 years 9 months old, to watch her third daughter, then 3 years $6^1/2$ months old.

The mother testified that she returned home for a short time after taking her two daughters to the day-care facility, only to leave again upon finding that her son was watching a movie and that her remaining daughter was asleep. Prior to leaving the

second time, the mother instructed her son to keep the doors locked and to escort the remaining daughter to the day-care facility when she awoke.

According to the mother, she was gone for approximately 2½ hours, returning home at about 11:10 a.m. Upon her return, she found attached to her door a handwritten note on the back of a sheet of paper denoted "OMAHA POLICE DIVISION STREET RELEASE," which note read: "Attention: [mother's name] Your children have been taken into protective care. Please call Gary DIETRICH . . . ." The mother thereafter called Dietrich, who told her to call one James Willis, the Deputy Douglas County Attorney who later filed the petition described in part I, *supra*. Willis was unable to give the mother much information, as he was waiting for someone else to gather additional information.

The mother also telephoned the day-care facility, inquiring about her two younger daughters. She was told she could not retrieve the children because they had been placed on "hold." Apparently, the county attorney's office, after being notified by the day-care provider that the infant had a not-unprecedented black eye, asked the provider not to return the infant to the mother.

The department contacted the mother that afternoon, and a caseworker was then sent to the mother's residence. At the meeting which followed, the mother told the caseworker the infant's eye was bruised when, while the mother was home, one of the other children opened a cupboard door into the infant while the two were playing. Although it was denied by the mother, the caseworker testified that the mother admitted permitting her 3½-year-old daughter to play unattended in a park across the street from the mother's residence. The mother also told the caseworker she saw nothing wrong with leaving her 8½-year-old son to take care of the 3½-year-old for as long as 2½ hours.

The caseworker asked the mother to submit to a drug test that afternoon, to which the mother initially agreed. The caseworker thereupon took the mother to a hospital for administration of the test. Upon arrival, the mother entered the hospital quickly and thereafter eluded the caseworker. As a

consequence, no test was administered that day.

The mother testified that she called her attorney upon arrival at the hospital and that she delayed the test pending a meeting with the attorney, which could not be arranged until the following week. The mother did undergo a drug urinalysis on August 14, 1990, the results of which were negative. However, the infant's father, who was then living with the mother, testified that as recently as June he had seen the mother use drugs.

## IV. FINALITY OF ORDERS

Before undertaking an analysis of the mother's summarized assignments of error, we address the State's claim that we lack jurisdiction to consider these appeals. The State correctly points out that we are without jurisdiction to entertain appeals from nonfinal orders. *In re Interest of J.M.N.*, 237 Neb. 116, 464 N.W.2d 811 (1991). Thus, the issue is whether the orders from which this appeal was taken were final within the meaning of Neb. Rev. Stat. § 25-1911 (Reissue 1989), which provides that a "judgment rendered or final order made by the district court may be reversed, vacated or modified by the Supreme Court for errors appearing on the record." The proceedings of a separate juvenile court are reviewed in accordance with § 25-1911. See Neb. Rev. Stat. § 43-2,126 (Cum. Supp. 1990).

Neb. Rev. Stat. § 25-1902 (Reissue 1989), a statute which has remained virtually unchanged throughout the course of Nebraska's statehood (see, Rev. Stat. § 581 (1867); Rev. Stat. § 8176 (1913); Comp. Stat. § 9128 (1922); Comp. Stat. § 20-1902 (1929)) provides:

> An order affecting a substantial right in *an action*, when such order in effect determines the action and prevents a judgment, and *an order affecting a substantial right made in a special proceeding*, or upon a summary application in an action after judgment, is a final order which may be vacated, modified or reversed, as provided in this chapter.

(Emphasis supplied.)

Thus, § 25-1902 describes three types of order as final: (1) one affecting a substantial right in an action and which in effect

determines the action and prevents a judgment; (2) one affecting a substantial right made in a special proceeding; and (3) one affecting a substantial right made upon a summary application in an action after judgment. This classification has been specifically recognized on numerous occasions. See, e.g., *Grantham v. General Telephone Co.*, 187 Neb. 647, 193 N.W.2d 449 (1972); *Otteman v. Interstate Fire & Cas. Co., Inc.*, 171 Neb. 148, 105 N.W.2d 583 (1960); *Clarke v. Nebraska Nat. Bank*, 49 Neb. 800, 69 N.W. 104 (1896) (statute is composed of two categories, the second of which consists of two subcategories). All three types share the requirement that a substantial right be affected. In addition, the first category requires that the order arise in an "action" and that it "in effect determines the action and prevents a judgment." The second type requires only that the order affect a substantial right in a "special proceeding"; unlike the first type, there is no corresponding requirement that the order effectually determine the action and prevent a judgment. The third type requires that the order be made "upon a summary application in an action *after* judgment." (Emphasis supplied.)

We have not always, in considering whether an order is appealable, focused on the nature of the proceeding in which the order was rendered and thus have not always articulated with which of the three possible types of final order we were concerned.

For example, in *Rehn v. Bingaman*, 157 Neb. 467, 59 N.W.2d 614 (1953), a proceeding for adjustment of a claim against a decedent's estate, this court, without specifying whether the challenged order arose in an action or a special proceeding, ruled that an order denying a motion for summary judgment was not final, observing that "an order is final for the purposes of an appeal when it determines the rights of the parties; and no further questions can arise before the court rendering it except such as are necessary to be determined in carrying it into effect. [Citations omitted.]" 157 Neb. at 472, 59 N.W.2d at 617-18. Judge Paul E. Boslaugh, in a concurring opinion, objected to the majority's failure to consider the type of proceeding in which the order was rendered:

The basis of the decision . . . should have been that the

order sought to be reviewed by this appeal was one made in a special proceeding but it was not "an order affecting a substantial right." The majority opinion states that the denial of a motion for a summary judgment did not determine the *action*, did not prevent a judgment, or affect a substantial right. This is followed by the assertion that an order is final for purposes of appeal when it determines the rights of the parties and no further questions can arise before the court rendering it except those incident to the enforcement of the adjudication. This is all immaterial and foreign to this proceeding except the conclusion that the denial of the motion did not affect a substantial right.

. . . .

Any proceeding in a court by which a party prosecutes another for enforcement, protection, or determination of a right or the redress or prevention of a wrong involving and requiring the pleadings, process, and procedure provided by the code and ending in a final judgment is an action. Every other legal proceeding by which a remedy is sought by original application to a court is a special proceeding. A special proceeding within the meaning of the statute defining a final order must be one that is not an action and is not and cannot be legally a step in an action as a part of it. None of the many steps or proceedings necessary or permitted to be taken in an action to commence it, to join issues in it, and conduct it to a final hearing and judgment can be a special proceeding within the terms of the statute. A special proceeding may be connected with an action in the sense that the application for the benefit of it and the other papers and orders concerning it may be filed in the case where the record of the filings in the action are [sic] made—as for instance garnishment or attachment—but it is not an integral part of or a step in the action or as it is sometimes referred to in such a situation a part of the "main case." The distinction between an action and a special proceeding has been clearly recognized by this court. In Turpin v. Coates, 12 Neb. 321, 11 N.W. 300, it is said: "A special proceeding

    may be said to include every special statutory remedy
    which is not in itself an action."

(Emphasis in original.) 157 Neb. at 473, 479, 59 N.W.2d at 618, 620-21.

It is clear beyond dispute that the subject orders were not entered after judgment; thus, the third type of order described by § 25-1902 is not involved. "Action," as that term is used in the Nebraska statutes, has, since Nebraska attained statehood, meant a civil action. See, Rev. Stat. § 2 (1867); 1867 Neb. Laws, § 1, p. 71; Rev. Stat. § 7560 (1913); Comp. Stat. § 8503 (1922); Comp. Stat. § 20-101 (1929); Neb. Rev. Stat. § 25-101 (Reissue 1989). Civil actions are governed by Neb. Rev. Stat. ch. 25 (Reissue 1989). Although "special proceeding" has no statutory definition, this court has, for nearly 110 years, construed the phrase to mean every civil statutory remedy which is not encompassed in what is now chapter 25.

In *Turpin v. Coates*, 12 Neb. 321, 323, 11 N.W. 300, 301 (1882), the first case to construe the meaning of special proceeding in determining whether an order was final, this court held: "A special proceeding may be said to include every special statutory remedy which is not in itself an action." The court went on to hold that an order discharging garnishees affected a substantial right and, since rendered in a special proceeding, was a final order. For further examples of special proceedings, see, e.g., *In re Estate of Snover*, 233 Neb. 198, 443 N.W.2d 894 (1989) (effort to remove a personal representative); *Grantham v. General Telephone Co.*, 187 Neb. 647, 193 N.W.2d 449 (1972) (summary judgment); *Ropken v. Ropken*, 169 Neb. 352, 99 N.W.2d 480 (1959) (divorce action); *Sullivan v. Storz*, 156 Neb. 177, 55 N.W.2d 499 (1952) (suit for breach of promise of marriage and seduction); and *Egan v. Bunner*, 155 Neb. 611, 52 N.W.2d 820 (1952) (accounting by personal representative).

More directly in point, this court has held that litigation under the juvenile court act declaring a juvenile to be dependent

and neglected was a special proceeding and that the order placing the juvenile's custody with the State was final within the meaning of § 25-1902. See, *Krell v. Sanders*, 168 Neb. 458, 96 N.W.2d 218 (1959); *State v. Loomis*, 195 Neb. 552, 239 N.W.2d 266 (1976).

As the orders in question arose in a special proceeding, the only thing which remains to be decided on the issue of their appealability is whether they affect a substantial right of the mother.

It has long been established that parents have a recognized liberty interest in raising their children. *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S. Ct. 571, 69 L. Ed. 1070 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 43 S. Ct. 625, 67 L. Ed. 1042 (1923).

There is no question that both the ex parte temporary detention order and the later detention order interfered with the mother's rights in her infant daughter. The issue is whether that interference was substantial.

In *In re Interest of Roman*, 212 Neb. 919, 327 N.W.2d 36 (1982), this court held that an order of the district court which reversed and remanded the order of the county court sitting as a juvenile court terminating parental rights was a final order.

*In re Interest of Aufenkamp*, 214 Neb. 297, 333 N.W.2d 681 (1983), held that an adjudication order finding a juvenile to have violated state law was an appealable order, but that a predisposition order placing the juvenile in a correctional facility for evaluation preliminary to a dispositional hearing was not. *In re Interest of V.T. and L.T.*, 220 Neb. 256, 369 N.W.2d 94 (1985), a dependency and neglect case, reaffirmed the *Aufenkamp* court's holding regarding the finality of an adjudication order. *In re Interest of J.M.S.*, 218 Neb. 72, 352 N.W.2d 186 (1984), another delinquency case, reaffirmed the nonfinality of a predisposition order which placed each juvenile in a correctional facility for evaluation for a period of not more than 30 days.

However, *In re Interest of B.M.H.*, 233 Neb. 524, 446 N.W.2d 222 (1989), another dependency and neglect case, ruled that an order by the separate juvenile court requiring a parent to participate in psychological therapy and also requiring the

department to pay for such therapy was a final order.

*In re Interest of C.D.A.*, 231 Neb. 267, 435 N.W.2d 681 (1989), held that an order refusing to permit the withdrawal of an answer of no contest entered at an adjudication hearing was not a final order. The decision rested not on a finding that no substantial right in a special proceeding had been affected but, instead, on findings that the ruling on the motion to withdraw the no contest answer did not affect the parent's relationship with his child and was therefore interlocutory rather than final.

Thus, the question of whether a substantial right of a parent has been affected by an order in juvenile court litigation is dependent upon both the object of the order and the length of time over which the parent's relationship with the juvenile may reasonably be expected to be disturbed.

For the reasons detailed in the analysis of the mother's constitutional concerns in part V(1), *infra*, we conclude the ex parte temporary detention order is nonfinal and thus not appealable, but that the later detention order is a final, appealable order.

## V. ANALYSIS OF SUMMARIZED ASSIGNMENTS OF ERROR

The foregoing matters having been addressed, we turn our attention to the summarized assignments of error.

### 1. JUVENILE COURT'S ASSERTION OF JURISDICTION

The mother first asserts that the ex parte temporary detention order and subsequent detention order failed to confer jurisdiction on the juvenile court because the sections of the Nebraska Juvenile Code under which they were entered deprive her of a recognized liberty interest, in violation of her right to due process of law under the state and federal Constitutions. More specifically, she claims that the ex parte order violated her right to be free from unreasonable seizures as guaranteed by Neb. Const. art. I, § 7, and that the alleged code violations violated various rights guaranteed by Neb. Const. art. I, § 1, and the first, fourth, fifth, and ninth amendments to the U.S. Constitution. In addition, she claims the ex parte order was entered in violation of various statutory provisions, as described in part V(1)(a)(ii), *infra*.

With respect to the constitutional claims, we note that the mother, while invoking the constitutional provisions last mentioned, has not articulated independent arguments regarding each provision claimed to have been violated, choosing instead to treat all of them as components of the alleged denial of due process. Therefore, pursuant to the rule that errors assigned but not discussed will not be considered, see, *City of Lincoln v. ABC Books, Inc., ante* p. 378, 470 N.W.2d 760 (1991), and Neb. Ct. R. of Prac. 9D(1)d (rev. 1989), we limit our analysis to the due process claim.

(a) Ex Parte Temporary Detention Order

To state the obvious, inasmuch as we have concluded that the ex parte order is not appealable, the mother's claims of error in connection with its entry are not properly before us. We discuss the issues raised thereby only to document the reasoning which leads to the conclusion that the ex parte order is not final.

*(i) Claimed Constitutional Deficiency*

As this court recently stated in *State v. Cook*, 236 Neb. 636, 645, 463 N.W.2d 573, 579 (1990), citing *Washington v. Harper*, _____ U.S. _____, 110 S. Ct. 1028, 108 L. Ed. 2d 178 (1990), when examining a claim that one is being deprived of a liberty interest without due process of law, a three-stage analysis is employed:

> The question in the first stage is whether there is a protected liberty interest at stake. If so, the analysis proceeds to the second stage, in which it is determined what procedural protections are required. Upon the resolution of that issue, the analysis moves on to the third and final stage, in which the facts of the case are examined to ascertain whether there was a denial of that process which was due.

As to the first stage, there is no question that, as established in part IV, *supra*, a parent has a liberty interest in raising her or his child, a concept which encompasses the child's custody, care, and control. We thus move on to the second stage of the due process analysis, which, as noted in *Cook, supra* at 645, 463 N.W.2d at 579, involves a consideration of three elements:

> In embarking on the second stage of the analysis, we

recall that "[t]he procedural protections required by the Due Process Clause must be determined with reference to the rights and interests at stake in the particular case." *Washington v. Harper, supra* at 110 S. Ct. at 1040-41. As noted in *Mathews v. Eldridge*, 424 U.S. 319, 334-35, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976): "[R]esolution of the issue whether the . . . procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected. [Citations omitted.] More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: *First*, the private interest that will be affected by the official action; *second*, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and *finally*, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or sub-stitute procedural requirement would entail. [Citation omitted.]"

As to the first element involved in determining the procedural protections required, there can be no question that the mother's interest is significant. However, the effect of the ex parte temporary detention order on that interest is tempered by its short duration. It hinges continued custody in the department on further action by the State. The effect of the ex parte order on the mother's liberty interest is further tempered by the fact that the order plays no part in determining the propriety of continuing further temporary custody in the department until adjudication.

The next element relates to the risk of an erroneous deprivation of the mother's interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards.

Neb. Rev. Stat. § 43-248 (Reissue 1988) authorizes the warrantless seizure of a juvenile "when such juvenile is seriously endangered in his or her surroundings and immediate removal appears to be necessary for the juvenile's protection . .

. ." Neb. Rev. Stat. § 43-250 (Reissue 1988) contemplates that a juvenile so removed and placed in the custody of the department must be released if a court order authorizing the placement is not issued within 48 hours of the seizure. While requiring an adversarial hearing before any order is entered, as the mother suggests, would undoubtedly reduce the likelihood of erroneous seizures, it would at the same time impose an unreasonable hindrance on taking emergency action to save an endangered juvenile. This is particularly so when, as developed in part V(1)(b), *infra*, an adversarial hearing must be held within a reasonable period of time after the seizure in order that a prolonged temporary period of separation of the juvenile from the parent may be ordered.

Indeed, the hindrance the mother's suggestion would impose on the State brings us to the third and final element to be considered when determining what process is due in a given situation: the governmental interest. This determination includes weighing "the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

Under the doctrine of parens patriae, the State is vested with power to set standards for the care and protection of children within its borders. See *Cornhusker Christian Ch. Home v. Dept. of Soc. Servs.*, 227 Neb. 94, 416 N.W.2d 551 (1987). One would be hard pressed to cite a governmental interest of greater import. It is pursuant to this interest that the State has enacted the Nebraska Juvenile Code. The sheer magnitude of this interest renders acceptable a certain degree of risk that the State will, on rare occasion, make erroneous short-term seizures and placements of juveniles.

From the foregoing, it becomes clear that the process which is due in order that the State may temporarily seize and place an endangered juvenile outside the parent's home pending the filing of a petition requesting continued placement of the juvenile until adjudication must be responsive to the parent's liberty interest while not eviscerating the State's parens patriae interest.

We thus move to the third and final stage of our due process

analysis, in which the facts of this case are examined to ascertain whether there was a denial of that process which was due.

Under such facts the ex parte temporary detention order was akin to a temporary restraining order in that it was, by its terms, of limited duration and designed to preserve the status quo until an adversarial hearing could be held. See, e.g., *State ex rel. Beck v. Associates Discount Corp.*, 161 Neb. 410, 73 N.W.2d 673 (1955). Allowance of such ex parte temporary action is a reasonable reaction to a perceived emergency situation involving a matter of utmost State interest and thus a legitimate exercise of the State's power under the parens patriae doctrine.

The State suggests in its brief that, in any event, in certain emergency circumstances it may act "without regard to the requirements of due process." Brief for appellee at 10. This may be true for those who live in some societies, but it is not true for those who live under the flag of the United States of America. What the foregoing due process analysis does demonstrate, however, is that different situations call for differing degrees of due process.

Therefore, the State may not, in exercising its parens patriae interest, unreasonably delay in notifying a parent that the State has taken emergency action regarding that parent's child nor unreasonably delay in providing the parent a meaningful hearing.

Indeed, the procedures used in this case, although marginally meeting the requirements of due process under the facts, were shoddy.

The apparent failure of the State to document the facts on which the juvenile court relied in entering its ex parte temporary detention order on August 10 is more than a little bothersome. What saves the juvenile court's jurisdiction in that regard is that the evidence adduced at the August 24 hearing supports what was done 14 days earlier. However, as the mother argues, the better practice, and the practice which shall henceforth be followed, is that the information upon which the State seeks an ex parte temporary detention order be contained in the affidavit of one who has knowledge of the relevant facts and that such affidavit be presented to the juvenile court and be

made a part of the record of the proceedings. In addition, the affected juvenile's parent shall be given prompt notice of the order.

### (ii) Claimed Statutory Violations

In addition to the foregoing meritless constitutional claims, the mother asserts the ex parte order is unenforceable because the State failed to establish that at the time of the seizure the infant was "seriously endangered in . . . her surroundings and immediate removal appear[ed] to be necessary for [her] protection," as required by § 43-248(3); failed to place the infant "in the least restrictive environment consistent with" her best interests, as required by § 43-250(4); and failed to make "reasonable efforts" prior to the infant's placement "to prevent or eliminate the need for removal and to make it possible for the [infant] to return to . . . her home," as required by Neb. Rev. Stat. § 43-254 (Reissue 1988).

However, whatever may be the remedy for the State's alleged failure to comply with the statutory requirements relating to the entry of an ex parte temporary detention order, the failure does not deprive the juvenile court of jurisdiction, for, as noted previously in part V(1)(a)(i), *supra*, the temporary detention order forms no basis for the order which followed. See *In re Interest of S.S.L.*, 219 Neb. 911, 367 N.W.2d 710 (1985).

### (b) Detention Order

The mother also claims that as several procedural safeguards which protect the rights of juveniles alleged to be delinquent are not extended to juveniles claimed to be dependent or neglected, the detention order of August 27 denied her due process of law and thus did not vest the juvenile court with jurisdiction over the infant.

This allegedly differing treatment purportedly arises from the use of the word "deliver" in § 43-250(4) and Neb. Rev. Stat. § 43-253 (Reissue 1988), the relevant portions of which read:

> When a juvenile is taken into temporary custody pursuant to subsection (3) of section 43-248 [the warrantless seizure provision employed in this case], the officer may *deliver* the custody of such juvenile to [the department] . . . .

(Emphasis supplied.) § 43-250(4).

> *Upon delivery* to the juvenile court or probation officer of a juvenile who has been taken into temporary custody under sections 43-248 and 43-250, the court or probation officer shall immediately investigate the situation of the juvenile and the nature and circumstances of the events surrounding his or her being taken into custody.

(Emphasis supplied.) § 43-253.

The mother argues that since, under the provisions of § 43-250(4), juveniles claimed to be dependent or neglected are taken into custody pursuant to the warrantless seizure provision and delivered directly to the department, they are not, as are juveniles claimed to be delinquent, delivered to the juvenile court. She therefore contends that § 43-253 does not apply to juveniles who are not claimed to be delinquent. The mother then postulates that as § 43-253 does not apply, Neb. Rev. Stat. § 43-275 (Reissue 1988), which purports to require that when "a juvenile is detained or placed in custody under the provisions of section 43-253 a petition or complaint . . . be filed within forty-eight hours excluding nonjudicial days," likewise does not apply. Therefore, under the mother's reading of the statutes, §§ 43-253 and 43-275 only provide procedural protection to juveniles who are alleged to be delinquent. The mother also points out that Neb. Rev. Stat. §§ 43-255 and 43-256 (Reissue 1988), both of which outline additional procedural protections, by their terms apply only to juveniles claimed to be delinquent. Her argument culminates in the conclusion that it is a denial of her right to due process to have a statutorily mandated procedure for juveniles alleged to be delinquent but not for juveniles asserted to be dependent or neglected.

However, the mother's reading of §§ 43-250(4) and 43-253 is overly narrow and thus wrong. By providing that the "department shall have no other authority with regard to such temporary custody until or unless there is an order by the court placing the juvenile in the custody of the department," § 43-250(4) clearly contemplates that upon seizure, the placement of the juvenile's temporary custody becomes a question for the juvenile court. An application for such an order constitutes a delivery of the seized juvenile to that court.

This necessarily means, as held in *In re Interest of S.S.L., supra*, that the filing time limit imposed by § 43-275 also applies. It is unfortunately true that the petition in this case was not filed within 48 hours, but whatever else the State's failure to comply with that statutory directive may do, it does not, in and of itself, create a jurisdictional defect. See *In re Interest of S.S.L., supra*. The failure does, however, raise due process concerns.

Thus, we return to the traditional due process analysis employed in concluding that the ex parte temporary detention order of August 10 is not appealable. See part V(1)(a), *supra*. Obviously, the consideration involved in the first stage of that analysis, the mother's interest, is the same under the August 27 detention order as under the ex parte order.

However, for purposes of the second stage of the analysis, in which the procedural protections required are determined, the detention order of August 27 differs from the ex parte order. This is so, for an adjudication hearing may be delayed for months. (Neb. Rev. Stat. § 43-271 (Reissue 1988) contemplates a delay of as long as 6 months from the date of filing the petition giving rise to the detention order.) Consequently, the mother's interest may be affected for a longer period of time under the detention order than it can be under the ex parte temporary detention order. Due process principles therefore require that the mother have been given a meaningful opportunity to be heard on the issue of whether a detention order should have been issued.

Having reached the third stage of the due process analysis, in which we determine whether the process due was given, we recall that the mother appeared at the August 24 hearing. Although she urges that "two weeks to wait for a hearing is not reasonable," brief for appellant at 20, she makes no claim that the timespan between whatever notification she received and the hearing was so short as to deprive her of a meaningful opportunity to be heard.

These circumstances, coupled with the fact that the mother was permitted to visit with the infant during the 14-day delay between the ex parte order and the August 24 hearing, lead us to conclude that the statutory procedures as applied to her

adequately protected against the risk of an erroneous deprivation of her interest and that the probable value of additional or substitute procedural safeguards is slight. Accordingly, the August 27 detention order did not violate the mother's due process rights. See *State ex rel. Miller v. Locke*, 162 W. Va. 946, 253 S.E.2d 540 (1979) (statute allowing child to be taken for no more than 10 days unless parents given 5 days' actual notice and a reasonable opportunity to be heard held to provide adequate due process, if properly applied).

We caution, however, that the 14 days elapsing between the entry of the ex parte order and the hearing poise the procedures employed in this case on the brink of unreasonableness. Even if for computing some 48-hour periods the concept of "judicial days" has valid meaning, it can have no validity when measuring longer interferences with the relationship between parent and child. Time is time, by whatever name it might be called. See *County of Riverside v. McLaughlin*, ____ U.S. ____, 111 S. Ct. 1661, 114 L. Ed. 2d 49 (1991) (delay of not more than 48 hours, including intervening weekend, between warrantless arrest and probable cause hearing presumptively comports with fourth amendment).

### 2. Evidential Rulings

In the second summarized assignment of error, the mother complains that in conducting the August 24 hearing, the juvenile court did not employ strict rules of evidence, admitted hearsay, and placed the burden of proving nonneglect on her.

#### (a) Applicable Evidential Rules

As to the appropriate rules of evidence, Neb. Rev. Stat. § 43-283 (Reissue 1988) authorizes the use of relaxed rules of evidence at "any dispositional hearing." Proceedings to terminate parental rights fall within the purview of § 43-283, and, thus, relaxed rules of evidence may be used in such proceedings. *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987). See, also, *In re Interest of A.H.*, 237 Neb. 797, 467 N.W.2d 682 (1991).

It would be anomalous indeed to permit the use of relaxed rules in determining whether a parent's rights in and to her or his child should be forever terminated but to insist on the use of

strict rules of evidence in determining whether a parent's rights should be interfered with temporarily while awaiting adjudication. While a dispositional proceeding has generally been thought of as a judicial determination concerning a juvenile's relationship to her or his parents made following an adjudication under § 43-247, *In re Interest of J.S., A.C., and C.S., supra*, a proceeding concerning the temporary placement of a juvenile pending adjudication is likewise dispositional in that, by its nature, the ruling involves a nonpermanent placement of a juvenile pending further judicial action. Thus, a hearing to determine who shall have custody of a juvenile pending an adjudication is in that sense dispositional; therefore, § 43-283 applies to such a proceeding, and relaxed rules of evidence may be followed.

### (b) Hearsay

The mother complains that hearsay was admitted. Even where relaxed rules of evidence may be employed, due process requires that the proceedings be fundamentally fair. *In re Interest of D.S. and T.S.*, 236 Neb. 413, 461 N.W.2d 415 (1990). Thus, certain hearsay may be inadmissible irrespective of whether strict rules of evidence apply.

However, in considering the mother's claim in this regard, it must be remembered that this court reviews appeals from juvenile proceedings de novo on the record and is thus required to reach a conclusion independent of the juvenile court's findings; provided, however, that where the evidence conflicts, this court considers and may give weight to the juvenile court's observation of the witnesses and acceptance of one version of facts over another. *In re Interest of Jones*, 230 Neb. 462, 432 N.W.2d 46 (1988); *In re Interest of Biesecker*, 214 Neb. 425, 333 N.W.2d 923 (1983).

Therefore, the improper admission of evidence in a juvenile proceeding does not, in and of itself, constitute reversible error, for as long as proper objection was made at trial, this court, in its review, ignores information which was improperly received. *In re Interest of D.S. and T.S., supra.*

### (c) Burden of Proof

The mother's claim that the juvenile court improperly placed

the burden of proof on her and that the State failed to establish that the infant's preadjudication placement with the department should be continued in the department arises from the following colloquy during opening statements:

THE COURT: . . . Now, I think you first started out by saying that two of the children were in foster care that day; right?

[MOTHER'S COUNSEL]: Your Honor, they were in — not foster care. They were in a licensed day-care home. They were in day-care.

THE COURT: And the eight-year old was left home alone.

[GUARDIAN AD LITEM]: With the — in charge of a three-year old.

THE COURT: Not just alone, but in the care of a three-year old. That right there is totally inappropriate, in my mind. You don't leave an eight-year old alone. And you don't leave an eight-year old alone in the care of a little one. That's neglect right there. That's an emergency, and the children have to be taken out of the home because the mother is not around.

. . . .

. . . Okay. She was going down to the county jail; right?

[MOTHER'S COUNSEL]: Yes.

THE COURT: She lived clear in South Omaha. She would be gone, I'll bet, for two hours.

[GUARDIAN AD LITEM]: I believe, Your Honor, the testimony was two and a half hours.

THE COURT: I would like to know anyone here who is — who has had kids would leave their eight-year old alone for three hours in the care of a three-year old. Raise your hands who would do that.

Clearly, the juvenile court's implied suggestion that the propriety of the mother's conduct was to be judged in accordance with the outcome of a poll is unfortunate, inappropriate, and not to be condoned. However, we need not address whether the juvenile court's comments were such as to constitute the imposition of a presumption of neglect on the mother because this court certainly indulges in no such

presumption.

### 3. ROLE OF GUARDIAN AD LITEM

Overlooking that the petition was filed by the county attorney and not the guardian ad litem, the mother, in the third summarized assignment of error, complains that the guardian ad litem was unlawfully permitted to prosecute the case. In doing so, she cites to Neb. Rev. Stat. § 43-272.01 (Cum. Supp. 1990), the relevant portions of which read:

(1) A guardian ad litem as provided for in subsections (2) and (3) of section 43-272 shall be appointed at the commencement of all cases brought under subdivision (3)(a) . . . of section 43-247 . . . .

(2) In the course of discharging duties as guardian ad litem, the person so appointed shall consider, but not be limited to, the criteria provided in this subsection. The guardian ad litem . . . (b) is not appointed to prosecute or defend the parents or other custodian of the protected juvenile but shall defend the legal and social interests of such juvenile. Social interests shall be defined generally as the usual and reasonable expectations of society for the appropriate parental custody and protection and quality of life for juveniles without regard to the socioeconomic status of the parents or other custodians of the juvenile . . . (e) may present evidence and witnesses and cross-examine witnesses at all evidentiary hearings, (f) shall be responsible for making recommendations to the court regarding the temporary and permanent placement of the protected juvenile . . . .

It is true that the guardian ad litem conducted much of the evidential presentation and argument against the mother. However, a guardian ad litem clearly has the authority to "present evidence and witnesses and cross-examine witnesses at all evidentiary hearings." § 43-272.01(2)(e); *In re Interest of D.C.*, 229 Neb. 359, 426 N.W.2d 541 (1988); *In re Interest of R.W.*, 236 Neb. 420, 461 N.W.2d 545 (1990). It necessarily follows that a guardian ad litem will adduce such evidence as he or she concludes will serve the interests of the juvenile and argue in favor of such disposition as the guardian concludes is best for

the juvenile. The question is not who adduced the evidence and persuaded the juvenile court, but what does the evidence prove and was the juvenile court's ruling correct?

### 4. PROPRIETY OF DETENTION ORDER

The foregoing question brings us to the fourth and last summarized assignment of error, the mother's claim that the juvenile court erred in continuing the infant's temporary care after seizure in the department.

The circumstances required to be established for continuing to withhold a juvenile's custody from her or his parent pending adjudication are found in § 43-254:

> If a juvenile has been removed from his or her parent, guardian, or custodian pursuant to subdivision (3) of section 43-248, the court may enter an order continuing detention or placement only upon a written determination that continuation of the juvenile in his or her home would be contrary to the welfare of such juvenile and that reasonable efforts were made, prior to placement, to prevent or eliminate the need for removal and to make it possible for the juvenile to return to his or her home.

Although Neb. Rev. Stat. § 43-279.01(3) (Cum. Supp. 1990) provides that when adjudicating whether a juvenile is dependent or neglected within the purview of § 43-247(3)(a) the State must establish its allegations by a preponderance of the evidence and that when seeking to terminate parental rights the proof must be clear and convincing, it is silent as to the quantum of proof required to satisfy the State's burden of proving that the custody of an alleged dependent or neglected juvenile should be in the department pending adjudication.

However, as the temporary placement is no more onerous than an adjudication that a juvenile is dependent or neglected such as to subject the juvenile to the jurisdiction of the juvenile court, we hold that proof by a preponderance of the evidence that such placement needs to be continued is sufficient. See *In re Interest of L.D. et al.*, 224 Neb. 249, 398 N.W.2d 91 (1986) (preponderance of evidence sufficient to support adjudication that juvenile was within purview of § 43-247(3)(a)).

The evidence of the mother's demonstrated unabashed

proclivity to leave her other children in their own care under the supervision of a not-quite-9-year-old, coupled with the evidence of her recent drug use, preponderates in favor of a conclusion that the infant is neglected such as to come within the purview of § 43-247(3)(a). The State need not wait to intervene until the infant suffers injury because she was left in the immature care of her oldest sibling.

## VI. JUDGMENT

The record failing to sustain any of the summarized assignments of error, we affirm the detention order of August 27, 1990.

AFFIRMED.