IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF XAVIER J.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF XAVIER J., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

KRISTAN L., APPELLANT.

Filed September 22, 2020.    No. A-20-255.

Appeal from the Separate Juvenile Court of Douglas County: AMY N. SCHUCHMAN, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Katherine M. Tupper for appellant.

Shinelle Pattavina, Deputy Douglas County Attorney, for appellee.

PIRTLE, RIEDMANN, and ARTERBURN, Judges.

PIRTLE, Judge.

### INTRODUCTION

Kristan L. appeals from an order of the Separate Juvenile Court of Douglas County granting the Department of Health and Human Services (the Department) continued custody of Xavier J., and providing that placement of Xavier be outside of Kristan's home. We affirm the order of the juvenile court.

### BACKGROUND

On February 14, 2020, the State filed a petition alleging that Xavier was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016), through no fault of his mother, Kristan.

- 1 -

Specifically, the pleadings alleged that Kristan had a state-appointed guardian; that Kristan had been diagnosed with schizophrenia, post-traumatic stress disorder, conversion disorder, a specific learning disorder with impairment in reading, intellectual disability, and a seizure disorder; that Kristan had a previous termination of parental rights to an older child; and that Kristan was unable to provide proper parental care, support, supervision, and/or protection for Xavier.

Also on February 14, 2020, the State filed an ex parte motion requesting that the juvenile court place Xavier in the immediate custody of the Department and outside his mother's home. The juvenile court granted the State's request and placed Xavier in the temporary custody of the Department in a foster home.

On March 4 and 5, 2020, a hearing was held in the juvenile court. At the hearing, the State and Xavier's guardian ad litem indicated they were requesting that Xavier remain in the Department's custody. Kristan resisted the State's request through counsel. Also present at the hearing was Kristan's guardian ad litem.

The State presented the testimony of Ashley Nelson, a child and family services specialist with the Department. Nelson testified that her duties and responsibilities with the Department included investigating reports that had been called into the Nebraska Child Abuse and Neglect Hotline. She stated that in conducting her investigations, she relies on past reports by Child and Family Services; any related criminal charges; conversations and evaluations from involved medical professionals; and conversations with family members and the children involved. On February 13, 2020, an anonymous caller conveyed concerns about Kristan's fitness to parent Xavier, and Nelson began an investigation.

Nelson testified that at the time she began her investigation, Xavier had just been born and was residing with Kristan at the University of Nebraska Medical Center in Omaha. Initially, Nelson spoke with Amie Wergin, Kristan's state-appointed guardian from the Office of the Public Guardian, on the phone. Wergin told Nelson that she had several concerns regarding Kristan's ability to parent Xavier. Specifically, Kristan had had a state-appointed guardian since 2016; Kristan had completed a parenting assessment at the end of 2019 that raised alarms regarding her parental abilities; and Kristan functioned at a fifth to sixth grade level, which led to worry as to her cognitive capacity to understand a child's development. Wergin told Nelson that she was concerned Kristan's lifelong seizure disorder might put her in a position where she would be unable to care for Xavier if she experienced a seizure. Wergin also expressed concerns about Kristan's demeanor and combativeness when challenged.

After her phone call with Wergin, Nelson spoke with Kristan at the hospital. Nelson explained to Kristan the report that had been received via the child abuse and neglect hotline. Nelson testified that Kristan was upset, but was "very open" in talking with Nelson about her diagnoses and prescriptions. However, Kristan denied that she had any intellectual disabilities during the conversation with Nelson. Kristan also claimed to have passed a parenting assessment. Nelson also asked Kristan about a termination of parental rights involving Kristan and an older child. Kristan claimed that her rights had been terminated to her older child because of a lie told to the State by either her father or her aunt, because they wanted to take the child for themselves. Nelson testified that after speaking with Kristan, she had concerns that Kristan denied any

intellectual disabilities and claimed she had passed a parenting assessment, neither of which were true.

While at the hospital, Nelson spoke with one of Kristan's nurses. The nurse told Nelson that while Kristan was actively trying to take care of Xavier, she required a lot of redirection. Nelson testified that Kristan called the nursing staff to help place Xavier in the bassinet, to help pull up the blankets on the bed, and to help change the thermostat.

Nelson testified that over the course of her investigation, she reviewed the parenting assessment of Kristan completed by Katherine Linder, a clinical psychologist, in December 2019, shortly before Xavier's birth. The results of Kristan's assessment "were consistent with an individual who struggles with understanding children's developmental needs and sees children's independence as threatening to her own status." The assessment found that Kristan was "likely to parent in a demanding style" and that she "lack[ed] abilities to nurture." The assessment found that Kristan posed a medium to high risk of engaging in abusive behavior toward her child.

Nelson testified that after the Department took custody of Xavier on February 14, she returned to Kristan's hospital room and told her Xavier had been made a ward of the State. Kristan then became very upset and began to cry. Nelson testified that Kristan again insisted that she had passed the parenting assessment. During this conversation, Kristan urged Nelson to speak with Tracy Jasinski, who she claimed was a doctor treating Kristan's seizure disorder. However, Nelson testified that when she called, Jasinski told her she was a nurse and not a doctor, and that her only focus in treating Kristan was to maintain her seizure medication. Nelson testified that Kristan's confusion over Jasinski's identity was worrying to her.

Over the objection of Kristan's counsel and Kristan's guardian ad litem, Nelson testified regarding conversations she had in the days following Xavier's placement with the Department. First, Nelson testified regarding a conversation she had with Wergin on February 20. Wergin told Nelson that Kristan and Kristan's mother had accused Wergin of calling child protective services out of a desire to prevent Kristan from being a mother. Nelson testified that she was concerned by Kristan reacting in such a "volatile way."

Nelson also testified about a conversation she had with Don Ficenec, who she stated was Kristan's "guardian ad litem in regards to her guardianship." Nelson testified that Ficenec voiced concerns about Kristan's combative demeanor. Ficenec also told Nelson that he did not support Kristan becoming her own guardian and that he believed Kristan would need to be 100 percent supervised in taking care of another person.

Nelson testified about a conversation she had with Aly Ott, an employee at Community Alliance. Ott reported to Nelson that Kristan had been managing her medications appropriately, but that there were concerns about Kristan's lack of healthy coping skills. Nelson testified that after this phone call, she was concerned that Kristan's lack of healthy coping skills might affect her ability to handle the stress of raising a newborn infant.

On cross-examination, Nelson admitted that she did not observe any signs Kristan was neglecting Xavier when she visited the hospital. She testified that after Xavier's removal, she conducted a walkthrough of Kristan's home, which did not provide her with any safety concerns. Nelson also admitted that it was her understanding Kristan had not experienced a seizure for over

a year. She testified she had not yet received records regarding the termination of Kristan's rights to her older child.

Regarding reasonable efforts made prior to the removal of Xavier, Nelson testified that she reviewed Kristan's medical records and spoke with Kristan and Kristan's mother to determine if there was a way Kristan could live with a family member. Nelson clarified that she did not explore a safety plan after learning that Kristan had no family members available to move in with her to provide long-term supervision after Kristan and Xavier were released from the hospital.

Kristan's counsel called Ott to testify. Ott testified that she had personally met with Kristan on three occasions. She testified that Kristan participated in day programming through Community Alliance, that she met with a licensed mental health practitioner weekly, and that Kristan independently administered her own medications. On cross-examination, Ott testified that the services provided by Community Alliance are focused on helping adults with severe and persistent mental illnesses create structure and normalcy in their lives. She stated that her work with Community Alliance did not include services intended to help individuals with their parenting skills.

At the hearing, the juvenile court also received into evidence five exhibits: the affidavit for removal authored by Nelson, a November 2018 psychological evaluation of Kristan, a 2018 forensic competency report of Kristan, Linder's parenting assessment of Kristan, and a letter showing Kristan was enrolled in a parenting course and had already taken three of the six classes at the time of the hearing.

After the conclusion of evidence, the juvenile court ordered that Xavier remain in the Department's care and custody, to exclude the home of Kristan. This appeal followed.

ASSIGNMENTS OF ERROR

Kristan asserts, restated, that the juvenile court erred in (1) finding there was sufficient relevant evidence to support its order granting the Department continued custody of Xavier and (2) admitting evidence obtained by the State after Xavier's removal.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of LeVanta S.*, 295 Neb. 151, 887 N.W.2d 502 (2016). When the evidence is in conflict, however, an appellate court may give weight to the fact that the juvenile observed the witnesses and accepted one version of facts over another. *Id.*

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion. *In re Interest of B.R. et al.*, 270 Neb. 685, 708 N.W.2d 586 (2005).

ANALYSIS

*Sufficiency of Evidence.*

Kristan argues that the juvenile court erred in finding by a preponderance of the evidence that continued detention was necessary for the health and safety of Xavier. Specifically, she alleges the State failed to present evidence of any risk Xavier would face if returned to his mother's care and that there was no showing that reasonable efforts had been made prior to removing Xavier from Kristan's home.

Neb. Rev. Stat. § 43-254 (Cum. Supp. 2018) sets forth the requirements for continuing to withhold a juvenile from his or her parent pending adjudication, and it provides, in part, as follows:

> If a juvenile has been removed from his or her parent, guardian, or custodian [without a warrant as a result of concerns for the juvenile's safety], the court may enter an order continuing detention or placement upon a written determination that continuation of the juvenile in his or her home would be contrary to the health, safety, or welfare of such juvenile and that reasonable efforts were made to preserve and reunify the family if required under section 43-283.01.

Continued detention pending adjudication is not permitted under the Nebraska Juvenile Code unless the State can establish by a preponderance of the evidence at an adversarial hearing that such detention is necessary for the welfare of the juvenile. *In re Interest of Damien S.*, 19 Neb. App. 917, 815 N.W.2d 648 (2012). A detention hearing is a parent's opportunity to be heard on the need for removal and the satisfaction of the State's obligations. *Id.* In analyzing this question, the issue is whether allowing Xavier to live with Kristan is contrary to his welfare.

A review of the record from the March 2020 detention hearing shows that the State presented sufficient evidence to demonstrate that placement of Xavier in Kristan's home would be contrary to his health, safety, or welfare. In addition, there was evidence that reasonable efforts to preserve and reunify the family had been made prior to Xavier's removal.

Kristan first argues that the State failed to prove Xavier was at risk of harm if he remained in Kristan's care. She argues that there was no evidence her seizure disorder would actually result in harm to Xavier and that the risk of such harm was merely "speculative." Brief for appellant at 12. She also highlights testimony from Nelson that referenced reports from hospital nursing staff that she "was actively trying to care for Xavier and feeding him at appropriate times." *Id.*

In *In re Interest of M.B. and A.B.*, 239 Neb. 1028, 1030, 480 N.W.2d 160, 161-62 (1992), the Nebraska Supreme Court stated "[i]f evidence of the fault or habits of a parent or custodian indicates a risk of harm to a child, the juvenile court may properly take jurisdiction of that child, even though the child has not yet been harmed or abused."

Although there is no evidence in this case that the infant had been harmed or abused, there was evidence that Kristan posed a medium to high risk of engaging in child abuse and that she suffered from a seizure disorder that might render her incapable of caring for a child. Prior to Xavier's removal, several individuals close to Kristan raised concerns about Kristan's ability to parent Xavier. These people included Kristan's state-appointed guardian, a clinical psychologist, and nurses on the maternity floor.

At the hearing, Nelson expressed concerns over Kristan's combative demeanor, her inability to understand a child's needs, the fact that she had not acted as her own guardian since 2016, and Linder's parenting assessment, which found that Kristan posed a medium to high risk of engaging in child abuse. She also highlighted Kristan's seizure disorder. Nelson testified that when determining whether a child is in need of removal, she ordinarily considers information from a variety of sources, such as prior intakes by the Department, related criminal charges, insight from involved medical professionals, and conversations with family members.

Kristan accurately argues that there was no specific evidence that she had actually abused or neglected Xavier prior to his removal. However, it is undisputed that Kristan suffers from a seizure disorder, an intellectual disability, and other mental health issues; that she is not capable of acting as her own guardian at this time; and that a parenting assessment found Kristan posed a medium to high risk of engaging in child abuse. We conclude that the State proved by a preponderance of the evidence that Xavier was at risk of harm if he remained in Kristan's home.

The evidence at the hearing also showed that reasonable efforts to preserve and reunify the family had been made by the Department. Nelson testified that she spoke with Kristan and her mother about the possibility of any family members moving in with Kristan to help her care for Xavier. She testified that no family members were suggested by either woman and that she herself could not find any family in the area. In determining that reasonable efforts had been made by the State, the juvenile court pointed to Nelson's investigation as satisfying the requirements for reasonable efforts. We agree. Nelson's investigation showed that there were no individuals available who could move in with Kristan to provide supervision while Xavier lived in her home.

We conclude, therefore, that the juvenile court did not err when it determined the State had shown by a preponderance of the evidence that reasonable efforts had been made.

*Admission of Evidence Obtained After Removal.*

Kristan argues that even if the State satisfied its burden at the hearing, the juvenile court erred in considering evidence obtained by Nelson after Xavier's removal. Specifically, she points to testimony concerning Nelson's conversations with Ficenec and Jasinski, as well as followup conversations with Kristan and Wergin and a forensic competency report concluding Kristan was not capable of serving as her own legal guardian. She argues that the evidence was "irrelevant to the determination of risk of harm since [Nelson] would not have known it or considered it in her risk of harm analysis." Brief for appellant at 13.

We note first that strict rules of evidence do not apply at any dispositional hearing. Neb. Rev. Stat. § 43-283 (Reissue 2016). The Supreme Court has ruled that a hearing to determine who shall have custody of a juvenile pending an adjudication is dispositional, and that therefore, § 43-283 applies to such a proceeding, and relaxed rules of evidence may be followed. See *In re Interest of R.G.*, 238 Neb. 405, 470 N.W.2d 780 (1991), *disapproved on other grounds, O'Connor v. Kaufman*, 255 Neb. 120, 582 N.W.2d 350 (1998). In circumstances where under relaxed rules of evidence may be employed, due process requires that the proceedings be fundamentally fair. *In re Interest of R.G., supra.*

It was not error for the juvenile court to overrule Kristan's objections to portions of Nelson's testimony that related to information obtained after Xavier was placed in the

Department's custody. Both Kristan's counsel and her guardian ad litem objected to these portions of testimony on relevance grounds. In her brief, Kristan does not argue that the hearing was rendered fundamentally unfair by the admission of the testimony, she merely reiterates her argument that at the time of removal, only a "limited investigation" had been conducted and "no risk of harm [to Xavier had] been identified." Brief for appellant at 14. However, the bulk of Nelson's testimony related to information she learned on February 13 and 14, 2020, before the State filed its ex parte motion to remove Xavier from Kristan's home, and we do not find that admitting additional testimony about Nelson's followup conversations with individuals close to Kristan was fundamentally unfair.

Additionally, even if we do not consider the information Nelson did not have available at the time she authored her affidavit for removal, there was still sufficient evidence for the juvenile court to find the State had met its burden by a preponderance of the evidence, as we discuss above.

We find no abuse of discretion in the court's ruling, nor do we find that the admission of the testimony violated fundamental due process.

CONCLUSION

Upon our de novo review, we find the juvenile court did not err in finding that continued detention, pending adjudication, was necessary as the child was at risk for harm in his mother's home and that reasonable efforts had been made prior to removal. We also find that the juvenile court did not abuse its discretion in overruling Kristan's objections to certain portions of Nelson's testimony. Accordingly, we affirm the order of the juvenile court.

AFFIRMED.