IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF MADDISON S. & MATTHEW S.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF MADDISON S. AND MATTHEW S., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

HEATHER S., APPELLANT.

Filed December 21, 2021.    No. A-21-391.

Appeal from the Separate Juvenile Court of Lancaster County: SHELLIE D. SABATA, Judge. Affirmed.

Lisa F. Lozano for appellant.

Patrick F. Condon, Lancaster County Attorney, and Haley N. Messerschmidt for appellee.

PIRTLE, Chief Judge, and RIEDMANN and WELCH, Judges.

WELCH, Judge.

## INTRODUCTION

Heather S. appeals the order of the Lancaster County Separate Juvenile Court awarding temporary legal and physical custody of her minor children with the Nebraska Department of Health and Human Services (DHHS) for placement outside of Heather's care.

## STATEMENT OF FACTS

Heather is the biological mother of twins Maddison S. and Matthew S., born in January 2018.

On Sunday, March 21, 2021, an unidentified party or parties contacted the child abuse hotline and law enforcement expressing concern about the care and well-being of Maddison and Matthew. When law enforcement arrived at Heather's home shortly after 4:38 p.m., there were four individuals present along with the two minor children. Officers questioned all four individuals present at the home: Alexis C., Heather's 16-year-old niece who was left in charge of the minor children; Arlene S., Alexis' 15-year-old female friend; and two teenage boys. Each of the teens admitted to drinking alcohol and smoking marijuana. Alexis told officers that she had been watching the children for days at a time since they were born and that Heather disappeared for extended periods of time to unknown locations. Alexis also told officers that she had been babysitting the children since approximately 5 p.m. on Friday, and that approximately 1 week earlier, she had watched the children for 4 days. Alexis reported that Heather would compensate her for watching the children by providing her with alcohol and marijuana. Alexis also stated that she was nervous about the children's care because she "regularly sees bruises on the children" and that "she feared for [the children's] safety because [she had observed] Heather [smoke] methamphetamine in front of the children." Alexis' friend, Arlene, initially told officers that they were babysitting to help out, but later admitted that the teens agreed to go to the home because they were allowed to drink alcohol and smoke marijuana. Arlene stated that she was afraid to tell the truth because she was scared of Heather because Heather had guns and that there were guns in the home.

After interviewing the teens, officers contacted Heather to request her to return to her home. Upon Heather's arrival at the home, she was "extremely confrontational" and "did not appear to be concerned for her children." Heather's main concern was that narcotic paraphernalia had been located inside her apartment and she repetitively denied ownership stating "[t]he narcotics and the narcotic paraphernalia is not mine." Heather also denied that guns were in the home, stating "no, the guns are in my car." Heather explained the children's bruising stating that "[the children] hit each other all the time." Heather's demeanor did not change after she was informed that the minor children were being removed nor did she ask to see her children.

Officers obtained a search warrant for Heather's home and, pursuant to their search, discovered rounds of 9-millimeter ammunition, 10.1 grams of methamphetamine, and narcotic paraphernalia including a few pipes and bongs. Locations where the evidence was found included Heather's bedroom closet, her dresser drawers, and a locked safe in her bedroom. Paraphernalia was located inside bags belonging to Heather along with Heather's other possessions, indicating that the items belonged to Heather, not the teenagers. Some of the items were within reach of the minor children.

Officers determined that the children were unsafe and at risk of harm requiring removal due to the children being in possession of, and having access to, dangerous items including methamphetamine, narcotics, and paraphernalia, which had been found in the home; the fact that the teenagers who were caring for the children admitted to smoking marijuana and drinking while providing care for the children; and bruising present on the children.

When the on-call caseworker, Alycia Carlston, arrived at the home, law enforcement informed her that they had already decided to remove the children. Carlston testified that, because law enforcement already determined that removal was necessary, she followed law enforcement's

lead regarding removal pursuant to DHHS policy and began to contact family supports for kinship placement and obtain information to complete a safety assessment. While gathering information, Carlston noticed that the children had observable "small bruising on [their] arms and legs" and that there was a "small bruise on Matthew's face." When asked about the bruising, Matthew stated that "he got hit," but did not identify who had hit him. An officer similarly observed that "[b]oth children were covered in bruises, head to toe." Carlston also became concerned with the children's access to dangerous items: Maddison brought Carlston "what appeared to be a glass water pipe that is commonly used for smoking marijuana, among other substances" and Matthew was playing with a "square piece of metal" and, at one time, was also holding a partially empty alcohol bottle. Carlston testified that she

> was concerned with the water pipe, especially, because Maddison was trying to drink out of it. And I was not sure what had been contained . . . in the water pipe, so I placed it out of her reach . . . and told her that it was not something that we play with. And, as for the metal object, it had sharp corners on it and I was concerned about that, so I placed that out of Matthew's reach as well.

The minor children were removed from Heather's care that day and placed with relatives.

On March 23, 2021, the State filed an adjudication petition alleging that the minor children were children within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). Specifically, the adjudication petition alleged that the minor children lacked proper parental care by reason of Heather's fault or habits and/or Heather neglected and refused to provide proper or necessary subsistence, education, or other care necessary for the health, morals, or well-being of the children, and/or the minor children were in a situation dangerous to life or limb or injurious to their health or morals based upon the following facts: (1) that on or about March 21, controlled substances, drug paraphernalia and/or alcohol were located within the residence where Heather and the minor children reside and/or were within reach of the minor children; (2) that on or about March 21, Heather appeared to be under the influence of drugs and/or alcohol; (3) that on one or more occasions from January 1 to March 21, Heather left the minor children with inappropriate caretakers and/or caretakers who were unable to adequately care for them; and (4) that Heather's actions placed the minor children at risk of harm.

A protective custody hearing regarding the removal of the children was held over 3 days in March and April 2021. Evidence adduced at the protective custody hearing included facts as previously set forth above. Additionally, Carlston, a DHHS child and family services specialist, testified that the day after the minor children were removed, she completed a safety assessment. A safety assessment is to be completed within 24 hours of DHHS' contact with a family and is used to determine if the children are considered to be safe, unsafe, or conditionally safe in their environment and the situation that had occurred. In completing the safety assessment in this case, Carlston relied upon law enforcement's decision to remove the children, her observations while in the home, and her conversations with the minor children and Heather's mother.

Carlston testified that the services DHHS would offer to the family included supervised visitation, transportation, family support, an initial diagnostic interview with a substance use component and any recommended services, random drug testing, trauma assessments for the minor

children, educational decision maker referrals for the minor children, hair follicle tests for the minor children, transportation, and a parenting assessment and any recommended services. However, after receiving information regarding a district court order prohibiting contact between Heather and the children, supervised visitation was no longer permitted.

Carlston testified that, in her opinion, it was in the children's best interests to remain in DHHS custody and in their current placement due to Heather's lack of cooperation which had prevented DHHS from setting up or beginning any services. Although Heather was permitted to participate in supervised visitation, the district court implemented a no-contact order with the children as a result of the criminal charges Heather received for issues related to the same reasons the children were removed. Additionally, Carlston also mentioned that there was a possibility of a "broadcast" issued for Heather which meant that if Heather was pulled over while driving or had any other contact with law enforcement, officers could take Heather into custody leaving the children without a caregiver.

Heather's mother, testifying on Heather's behalf, stated that, during the time that she had witnessed Heather parent, she did not see narcotics, firearms, or see Heather engage in violence towards the children, although she did acknowledge that Heather had previously used substances. Heather's mother testified that Maddison and Matthew previously lived with her for a few months in 2019 when Heather was homeless and that the last time she was aware that Heather had used any substances was during the time that Heather was homeless. Similarly, Heather's boyfriend, Brian Baker, testified that Heather did not use violence to discipline her children, nor did he know her to use substances or possess firearms in her home, however he did admit that he was represented by an attorney in a separate pending matter for possession of methamphetamine and that he had previous charges relating to possession of methamphetamine. Baker further testified that, during the weekend prior to the children's removal, he witnessed Heather pay Alexis $250 to care for the children.

On March 21, 2021, the children were removed in accordance with Neb. Rev. Stat. § 43-248(2) (Cum. Supp. 2020). The following day the court held an ex parte hearing on the State's motion for emergency temporary custody, and subsequently entered a temporary order placing the minor children in the custody of DHHS. The court then held a full hearing for continued detention pending adjudication pursuant to Neb. Rev. Stat. § 43-254 (Cum. Supp. 2020) over 3 days in March and April 2021. Following the hearings, the juvenile court continued temporary legal and physical custody of the minor children with DHHS and placed the children in a kinship foster home under the jurisdiction of DHHS. Specifically, the court found that continuation of the minor children in their home would be contrary to their welfare and that, prior to placement, reasonable efforts were made to prevent or eliminate the need for removal and to make it possible for the minor children to safely return home including: relative family placement, supervised parenting time, family support services, random drug and/or alcohol testing, substance use evaluation, SDM assessments, transportation assistance, Nebraska Early Childhood Development Network referrals, trauma assessments, hair follicle testing and ongoing case management. Heather has timely appealed to this court.

## ASSIGNMENTS OF ERROR

Heather contends that the juvenile court erred in continuing the children's temporary legal and physical custody with DHHS and finding that DHHS had made reasonable efforts to prevent removal.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Giavonni P.*, 304 Neb. 580, 935 N.W.2d 631 (2019). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020).

## ANALYSIS

### CONTINUED REMOVAL

We first address Heather's claim that, following the protective custody hearing, the juvenile court erred in finding that temporary legal and physical custody of the children should remain with DHHS. Heather claims that "[in] the instant matter, a chain of misinformation was perpetuated to the point that led [her] children to be removed from her care." Brief for appellant at 12. She further contends that "had [DHHS] done a modicum of investigation, or reviewed the information in their possession, they would have concluded that the allegations were based on false information and the children should not have been removed from [Heather's] care." Brief for appellant at 13.

Section 43-254 provides, in pertinent part:

> If a juvenile has been removed from his or her parent, guardian, or custodian pursuant to subdivision (2) of section 43-248, the court may enter an order continuing detention or placement upon a written determination that continuation of the juvenile in his or her home would be contrary to the health, safety, or welfare of such juvenile and that reasonable efforts were made to preserve and reunify the family if required under section 43-283.01.

In interpreting § 43-254, the Nebraska Supreme Court has held that, although the State may obtain short-term temporary custody without a warrant or court order when necessary to protect a juvenile who is seriously endangered in his or her surroundings, continued detention pending adjudication is not permitted under the Nebraska Juvenile Code unless the State can establish by a preponderance of the evidence at an adversarial hearing that such detention is necessary for the welfare of the juvenile. *In re Interest of Anthony G.*, 255 Neb. 442, 586 N.W.2d 427 (1998). See § 43-254.

In accordance with that authority and Heather's first specific error assignment, we have performed a de novo review to determine whether the evidence supported the juvenile court's finding that continued detention was necessary for the welfare of the children. We find that it does.

In considering whether continued detention was necessary for the welfare of a child, the Nebraska Supreme Court in *In re Interest of R.G.*, 238 Neb. 405, 427-28, 470 N.W.2d 780, 795

(1991), *disapproved on other grounds, O'Connor v. Kaufman*, 255 Neb. 120, 582 N.W.2d 350 (1998), found that continued placement was necessary where

> [t]he evidence of the mother's demonstrated unabashed proclivity to leave her other children in their own care under the supervision of a not-quite-9-year-old, coupled with the evidence of her recent drug use, preponderates in favor of a conclusion that the infant is neglected such as to come within the purview of § 43-247(3)(a). The State need not wait to intervene until the infant suffers injury because she was left in the immature care of her oldest sibling.

Similarly, the evidence presented at the detention hearing in the instant case established that Heather frequently left the minor children in Alexis' care for extended periods of time, that the children were under the care of teenagers who admitted to drinking alcohol and smoking marijuana when officers arrived at the home, and that Alexis reported that Heather compensated her with alcohol and marijuana for watching the children. Alexis told officers that she worried for the children's safety when Heather was present because the children were covered in bruises and Heather smoked methamphetamine in front of the children. During their observations and safety assessment, law enforcement and Carlston observed that the children were covered in bruises and Matthew admitted that he been hit. Additionally, while Carlston and law enforcement were present in the home, Maddison was in possession of, and attempted to drink out of, a glass bong commonly used for smoking marijuana; Matthew was in possession of a partially empty open bottle of alcohol; and Matthew was playing with a "square piece of metal" that appeared dangerous for him to handle. Further, following a search conducted pursuant to a search warrant, officers located 10.1 grams of methamphetamine and live firearm ammunition inside the home. Finally, after being informed that her children were being removed, Heather expressed concern about the narcotics found at her home and did not ask to see her children or express concern about their welfare.

Based on our de novo review, we agree with the juvenile court that the evidence was sufficient to establish, by a preponderance of the evidence, that continued detention outside Heather's home pending adjudication was necessary for the health, safety, and welfare of Maddison and Matthew. This assigned error fails.

REASONABLE EFFORTS

Heather next argues that the juvenile court erred in finding that DHHS had made reasonable efforts to prevent removal of her minor children.

As previously indicated, § 43-254 provides that in order to continue detention pending adjudication, in addition to finding that detention is necessary for the welfare of the juvenile, the court must find that reasonable efforts were made to reunite the family if required under Neb. Rev. Stat. § 43-283.01 (Cum. Supp. 2020).

Section 43-283.01, which governs the requirements for reasonable efforts, provides in relevant part:

> (1) In determining whether reasonable efforts have been made to preserve and reunify the family and in making such reasonable efforts, the juvenile's health and safety are the paramount concern.

- 6 -

(2) Except as provided in subsections (4) and (5) of this section, reasonable efforts shall be made to preserve and reunify families prior to the placement of a juvenile in foster care to prevent or eliminate the need for removing the juvenile from the juvenile's home and to make it possible for a juvenile to safely return to the juvenile's home.

Here, the juvenile court found that reasonable efforts had been made to prevent or eliminate the need for removal and to make it possible for the minor children to return to Heather's home. The court's order stated:

[DHHS] has made reasonable efforts to make it possible for the juvenile to safely return to the juvenile's home, including: Relative Family Placement, Supervised Parenting Time, Family Support Services, Random Drug/Alcohol Testing, Substance Use Evaluation, [Structured Decision Making] Assessments, Transportation Assistance, Nebraska Early Childhood Development Network Referrals, Trauma Assessments, Hair Follicle Testing, [and] Ongoing Case Management.

Based on our de novo review, we find that there was sufficient evidence in the record to find that reasonable efforts had been made to reunify the family prior to the court entering the continuing custody order and placing the juveniles in a foster home. Prior to removal, law enforcement and DHHS conducted an investigation; DHHS assessed the safety of the children in the home; interviews were conducted of all of the teenagers in the home, Heather, and Heather's mother; law enforcement executed a search warrant to remove any dangerous substances or items from the home; and DHHS contacted family members for placement and the children were ultimately placed with family. Additionally, the evidence established that Heather refused to cooperate with DHHS in order to set up services for reunification and supervised visitation was later prohibited as a result of her criminal charges in relation to the removal of the children. After the minor children were removed from her care, Heather then had the opportunity to utilize services to participate in a safety plan to reunite with her children but failed to cooperate with DHHS or law enforcement. Heather did not provide any evidence showing why she was unable to participate or engage with DHHS or other services.

Although Heather contends that DHHS did not conduct an investigation which would have shown that the allegations provided to law enforcement were false, the record refutes this claim. Carlston, in conducting her investigation, relied on the officers' reports and observations; her own observations and reports; her training and experience in child abuse and neglect cases; information obtained from interviews and/or statements of the minor children, teenagers, and Heather's mother; and the physical evidence obtained from the home. Carlston used this information to complete a safety risk assessment to determine whether the children would be safe in the home. Her assessment provided that the children were unsafe and that the children were at risk of harm. Heather's argument that DHHS did not conduct its own investigation fails as it is not supported by the evidence.

In sum, based on the evidence adduced during the removal hearings, reasonable efforts were provided to prevent removal and to promote reunification, but Heather refused to cooperate. Therefore, we find no error in the juvenile court's findings regarding reasonable efforts.

## CONCLUSION

For the above stated reasons, we find under our de novo review the juvenile court did not err when it determined that continued placement outside of Heather's home was necessary for the safety and welfare of the children and that reasonable efforts were made to attempt to prevent removal and promote reunification. Therefore, we affirm the juvenile court's order.

AFFIRMED.