IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF KALIYAH C.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF KALIYAH C., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

SARAH C., APPELLANT.


Filed November 4, 2025.    No. A-24-842.


Appeal from the Separate Juvenile Court of Lancaster County: REGGIE L. RYDER, Judge. Affirmed in part, and in part reversed and remanded with directions.

Joshua D. Barber, of Barber & Barber, P.C., L.L.O., for appellant.

Patrick F. Condon, Lancaster County Attorney, and Jeremy P. Lavene for appellee.


PIRTLE, BISHOP, and FREEMAN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Sarah C. appeals the orders of the separate juvenile court of Lancaster County that adjudicated her daughter, Kaliyah C., as a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016), and continued legal custody of Kaliyah with the Nebraska Department of Health and Human Services (DHHS). The juvenile court also directed parental visitation to be determined by DHHS. After our de novo review, we ultimately affirm the court's adjudication of Kaliyah and her continued custody with DHHS. However, we find there was insufficient evidence to support the State's allegations relating to physical abuse and drug use. We also find the court improperly delegated its judicial authority regarding visitation. Accordingly, we affirm in part, and in part reverse and remand with directions, as discussed further below.

- 1 -

## II. BACKGROUND

### 1. PROCEDURAL BACKGROUND

Sarah is the mother of Kaliyah, who was born in 2008. Kaliyah's alleged father, Ronald R., lives out-of-state and is not a party to these proceedings.

On July 17, 2024, the State filed a petition seeking to adjudicate Kaliyah as a child within the meaning of § 43-247(3)(a). The petition specifically alleged:

a. Sarah [] has failed to provide a safe and stable home and/or adequately care for said juvenile.

b. Sarah [] has been physically abusive and emotionally abusive to said juvenile.

c. Sarah [] appears to have unaddressed or inadequately addressed mental health needs and has reported struggling with drug addiction in the past.

d. The above matters place said juvenile at risk of harm.

That same day, the State filed an ex parte motion for emergency temporary custody and a supporting affidavit. The State requested that the juvenile court place Kaliyah "in the safest and least restrictive placement pending a hearing." The court granted the State's motion, finding that Sarah "reportedly has significant mental health issues that significantly impact her ability to safely and appropriately parent the juvenile"; "[s]he reportedly also has been using methamphetamine"; she admitted to DHHS that she "does not have a safe home for the juvenile to reside in"; and these facts put Kaliyah at risk of harm. The court ordered temporary custody and placement of Kaliyah with DHHS. A protective custody hearing was set for July 24.

At the hearing, Sarah entered a denial to the allegations in the petition. She also requested the juvenile court "set the matter for a more formal hearing" because of time constraints. The court then set a combined protective custody and adjudication hearing for August 12, 2024. Sarah's counsel subsequently filed an unopposed motion to continue the hearing due to a scheduling conflict. The court granted the motion, and the hearing was continued to August 30.

At the outset of the hearing on August 30, 2024, all parties agreed on the record to combine the issues of protective custody and adjudication of the petition into a single proceeding, and the juvenile court advised Sarah of her various rights. The combined proceeding was held over the course of 3 days from August to October.

### 2. COMBINED PROTECTIVE CUSTODY AND ADJUDICATION PROCEEDING

During the combined proceeding, numerous witnesses testified, including Sarah. The juvenile court also received and considered various exhibits.

### (a) Kaliyah's Testimony

The State called Kaliyah as its first witness. At the time of her testimony, Kaliyah was a 15-year-old high school student. In the summer of 2023, Kaliyah went to live with Stormie E., her godmother, because Sarah "got evicted," "was homeless," and was residing in a women's shelter. Kaliyah stayed with Stormie from June 2023 to the beginning of August 2023. At that point, she returned to Sarah's custody, and the pair moved into an apartment.

According to Kaliyah, she and Sarah lived in this apartment until May 2024, but then Sarah was evicted from the apartment because of her refusal to pay rent. Sarah did not make payments due to her belief that people were coming into the apartment without permission. Sarah then took Kaliyah to stay at the home of a family friend, but this arrangement did not last because Sarah "thought the air was poisonous." Sarah and Kaliyah then moved to a motel for a week before Sarah decided to travel to Las Vegas, Nevada, to have a "fresh start." After a week in Las Vegas, Nevada caseworkers made contact and placed Kaliyah in a "two week hold." Sarah returned to Nebraska. During the hold, Kaliyah blocked Sarah's phone calls because she did not want to speak to her. Sarah drove to Las Vegas to take Kaliyah back to Nebraska after the hold expired, but Kaliyah refused to return with Sarah. Kaliyah explained this was because Sarah was accusing her of not being truthful to the Nevada caseworkers. Kaliyah eventually returned to Nebraska and was placed with Gail B., her maternal grandmother.

Kaliyah indicated she often had difficulties getting to school while living with Sarah. She specifically recounted that Sarah "refused to get up" "most of the time" and take her to school during the eighth grade. Kaliyah's many absences from school caused her to "fall[] behind in school" and fail her first period class. In the summer of 2024, Kaliyah signed up for summer school. Despite telling Sarah she could only miss 4 days, Kaliyah was unable to complete the program because of the move to Las Vegas. She was eventually unenrolled due to her absence.

When asked about her bond with Sarah, Kaliyah said that there had "never been a relationship" and that they argued constantly. A major strain in their relationship occurred after the sudden drug overdose death of her brother, Kalub C., in September 2022. After Kalub's death, Sarah accused Kaliyah of "not being truthful" and prohibited her from visiting family by taking her phone away "for weeks." Sarah also reportedly blamed Kaliyah and other family members for Kalub's passing which was "hurtful" and made Kaliyah "mad."

Kaliyah stated that during arguments, Sarah would yell and blame her. When asked if she felt safe living with Sarah, Kaliyah responded that she would "get scared" being around her when she was angry. There were a couple of instances where Sarah told her, "As long as you're making my life a living hell, I'll make your life a living hell." These statements took a toll on Kaliyah, and she lost her appetite and stopped eating while living with Sarah. Kaliyah was "miserable."

However, Kaliyah was only able to recall one time where Sarah made physical contact with her. At some point during Kaliyah's elementary school years, Sarah got angry, "slapped" her "across the face," and pulled her by her shirt collar. This occurred after one of Kaliyah's childhood friends stayed at Sarah's home longer than originally scheduled. Kaliyah stated the police were called, and Sarah blamed her for the authorities' involvement.

Kaliyah also testified about Sarah's mental health. She stated Sarah believed individuals were watching her through a Ring camera and hacking into her phone. Kaliyah described one instance where she went with Sarah to the FBI office in Lincoln, Nebraska, when she was in the eighth grade. Kaliyah overheard Sarah complaining to agents that individuals were entering her home and "mess[ing] with her papers." Kaliyah opined that Sarah appeared paranoid. Sarah believed people were following her and would "pull up" on people and take pictures of them because she believed they were stalking her. Kaliyah knew Sarah was "on a lot of medication," would retrieve it when she needed it, and had observed her ingest it in the past. However, at the time of her testimony, Kaliyah had not observed Sarah take any medication since Kalub's death in

2022. Kaliyah recalled one instance in 2023 when Sarah went to the courthouse to obtain a firearm permit. Sarah told Kaliyah that she knew "exactly who [she] would go after" and that she wanted to hire a hitman.

When Kaliyah was asked about Sarah's illegal drug use, she indicated she had no knowledge of whether Sarah used illicit substances. However, Kaliyah did have suspicions that those close to Sarah may be using drugs. She specifically recounted one time when Sarah's friend came over, went to the bathroom, and shut the door. After the friend exited the bathroom, Kaliyah entered and found a needle with a cap on the floor. This incident occurred while Kaliyah was in the eighth grade. When asked if she had ever seen her mother in an "impaired state," Kaliyah stated there were times Sarah would sleep "24/7 all day." This caused Kaliyah to be late for school.

### (b) Testimony From Godmother and Grandmother

Stormie (godmother) testified that Kaliyah lived with her in the summer of 2023 because Sarah was trying to move to a new residence due to "issues" with where she was staying. Sarah told Stormie that she did not trust her landlord because she "thought people were coming in," "moving things," and "messing" with the "Wi-Fi." Stormie agreed there were times when Sarah seemed paranoid or irrational. She recalled that Sarah believed everything was "bugged" and that people were "out to get her." Stormie stated Sarah's paranoia appeared after Kalub's death.

When asked about the relationship between Kaliyah and Sarah, Stormie described it as "very hectic" "most of the time." Sarah would accuse Kaliyah of being involved in Kalub's death and "talk down to her constantly." Kaliyah would be "distraught" and "shut down for hours" after getting into arguments with Sarah. Stormie believed Sarah's actions were negatively impacting Kaliyah.

Gail (grandmother) testified Sarah and Kaliyah lived with her "off and on over the years." According to Gail, Sarah had five to six residences over the past 7 years. Gail helped get Kaliyah to school and provided food, money, groceries, and childcare.

Gail provided insights into her own relationship with Sarah. Gail and Sarah used to "talk[] a lot" and she used to know "a lot more about her life." However, since Kalub's death, their relationship was "strained." Sarah seemed to believe that Gail had some involvement in Kalub's death, and Gail indicated she did not see Kaliyah as much after Kalub's passing.

Gail testified that Sarah had "always struggled with her mental health." In 2004, Sarah was diagnosed as "bipolar" and put on Lithium. At that time, the doctor told Gail that Sarah "would always need medication." Ten months before Kalub's death, Sarah's mental health was in decline and Gail obtained a temporary guardianship over Kaliyah in March 2022. The juvenile court received a certified copy of the case file regarding temporary guardianship of Kaliyah as exhibit 5. The petition for guardianship contained in exhibit 5 alleged that Sarah "signed a handwritten note relinquishing physical and legal custody" of Kaliyah to Gail. The temporary guardianship lasted until August 2022. Gail agreed Sarah suffered from paranoia.

Gail stated that Sarah "got into drugs and stuff pretty early, . . . 14 that I know of." "[M]eth was one of [Sarah's] drugs of choice back in the day," and she went through rehab. According to Gail, Sarah was prescribed opioids around 2014 or 2015 and "was doing the methadone stuff trying to get off the opioids." When asked whether Sarah's drug addiction continued into "recent times,"

- 4 -

Gail said that she "suspected things over the years" because Sarah had "severe weight loss" "a couple of times," but otherwise she had "no proof" of recent drug use.

Gail had observed the relationship between Sarah and Kaliyah and said that it was "pretty volatile," and it was "very clear that Kaliyah was unhappy[.]" Gail explained this unhappiness stemmed from Kaliyah's belief that she did not have stability and lacked food security. According to Gail, Kaliyah had to "fend for herself" when it came to food. However, on cross-examination, Gail clarified that her knowledge of Sarah and Kaliyah's relationship largely stemmed from reports made by Kaliyah.

Kaliyah had been placed with Gail since returning from Las Vegas. When asked how Kaliyah was doing in her care, Gail stated she was "doing a lot better," "her grades are all As and Bs with the exception of math," "[s]he eats regular[ly]," and "her outward demeanor has improved." Gail indicated that Kaliyah has exhibited "symptoms of really being afraid[.]" Kaliyah told Gail that she is "terrified of going back" to Sarah.

(c) School Records

Kirby Hute, the district registrar for Lincoln Public Schools, maintained and assisted in the generation of student records, including attendance. Kaliyah's "LPS Conference Absence Report" for the eighth and ninth grade was received as an exhibit by the juvenile court; it showed that Kaliyah had accrued 58.29 days of "[u]nexcused" absences during the eighth grade and 38.59 days of "[u]nexcused" absences during the ninth grade. The exhibit also contained a statement which indicated "LPS students," "on average," "miss fewer than 10 days per school year."

(d) Testimony From Support Workers, Caseworkers, and Therapists

Lisa Urwiller, a mental health community support worker for Blue Valley Behavioral, testified that her job centered on helping those "diagnosed with a severe and persistent mental illness" maintain independence in the community and obtain benefits. Urwiller worked with Sarah "about once a week" "on and off" since 2016.

Urwiller stated Sarah's housing situation was "[o]n and off," explaining that she had several different residences over the course of working with her. Sarah told Urwiller that income was the main reason behind her difficulties in maintaining housing. Sarah struggled with job stability and "would come and go at her jobs or be laid off[.]"

According to Urwiller, Sarah seemed paranoid and irrational at times. There were "several instances" when Sarah would express paranoid thoughts about people in the community, like that they were "messing with things in her home" or "out in the parking lot watching her." Sarah's paranoia had been "on and off for years," but it became worse after Kalub's death. When Urwiller asked Sarah if she was taking medication, Sarah said she was taking medicine for "ADHD."

Urwiller testified, over hearsay and foundation objections, that Sarah was diagnosed with "schizoaffective disorder bipolar type." During cross-examination, Urwiller conceded her knowledge of the diagnosis came from information received when looking at a Blue Valley Behavioral Health computer and by speaking to Sarah's therapists. However, Urwiller was unable to identify the name of the person who actually made the diagnosis. Urwiller acknowledged that she was not a licensed mental health practitioner, phycologist, or psychiatrist.

Urwiller was briefly asked about Kaliyah's "emotional situation." She responded that she was concerned about the "chaos" in Kaliyah's life, citing absences from school and the sudden move to Las Vegas.

Madeline Condon, an initial assessment caseworker for DHHS, first became aware of Kaliyah and Sarah after an intake was received in June 2024, which detailed concerns of Sarah's mental health and its impact on Kaliyah's wellbeing. Condon attempted to contact Kaliyah by visiting her at summer school. However, school officials informed Condon that Kaliyah was being unenrolled because of various absences. Condon eventually learned that Sarah and Kaliyah were in Las Vegas. Condon was able to communicate with Sarah via telephone. During this interaction, Sarah made contradictory statements about her stay in Las Vegas. At one point, Sarah told Condon that they had moved to Nevada, but Sarah subsequently indicated she and Kaliyah were only on a vacation. Condon asked Sarah if she could talk to Kaliyah, and Sarah said she would have Kaliyah call if Condon proved she was a state employee. Although Sarah was provided a picture of Condon's business card, Kaliyah never contacted Condon. Condon then made a report to "the hotline in Vegas due to the safety concerns still being unaddressed."

Nichole Cayou, a child and family service specialist for DHHS, testified to similar events. Cayou "assisted when there was an intake regarding [Sarah and Kaliyah] through Las Vegas" and she was the initial assessment worker after Kaliyah came back to Nebraska.

Cayou stated that she met with Sarah on June 24, 2024, and on July 16. During the first meeting, Sarah was in Nebraska, but Kaliyah remained in Las Vegas. According to Cayou, Sarah believed there "was a conspiracy against her to remove Kaliyah from her care." Sarah told Cayou that her relationship with Kaliyah "was [not] perfect," but "their relationship was not strained." In the second meeting on July 16, Sarah informed Cayou that she suffered from depression, anxiety, and ADHD. Cayou testified that during their conversations, Sarah was sometimes difficult to follow and would easily "get off track." When asked if Sarah made paranoid and irrational statements, Cayou responded that Sarah "had concerns about several of the homes that they had stayed in, people poisoning them, with technology people listening in or tracking her."

Cayou indicated that a safety plan was offered to Sarah on July 16, 2024, prior to the juvenile court's involvement. This safety plan would have placed Kaliyah with Gail, and Sarah would have had fully supervised visitation. However, Sarah did not agree to the safety plan. DHHS also offered family support services, transportation, a co-occurring evaluation, and family therapy to Sarah after Kaliyah's removal from Sarah's care.

Holly Parker, a child and family services supervisor for DHHS, testified that DHHS offered Sarah a co-occurring evaluation, family support services, bus passes and taxicab services, supervised visitation, and a safety plan. Parker also testified that Sarah did not want Kaliyah to return to her home on July 16, 2024, because "it was not a safe environment[.]"

Larka Vesper, a mental health therapist for Blue Valley Behavioral Health, provided testimony about Kaliyah's wellbeing. Vesper had been Kaliyah's therapist "for periods of time" since 2017. Throughout the therapy sessions, Kaliyah expressed how she felt "hurt" by Sarah's comments regarding the death of Kalub. There were times Kaliyah would indicate Sarah was not making meals and that there was little to eat. Kaliyah's appetite also decreased due to the stress of moving to Las Vegas. Vesper explained that Sarah would prevent Kaliyah from connecting with

family members, contributing to the development of "depressive type symptoms" and a "sense of hopelessness."

### (e) Sarah's Witnesses

McKenzie Jones, a psychiatric nurse practitioner, testified that she had been treating Sarah for approximately 2 years. To Jones' knowledge, Sarah had been taking her prescribed medications "to the best of her ability." However, Jones did acknowledge that Sarah had trouble accessing certain prescriptions due to her limited financial resources. A copy of Sarah's medical records, received into evidence as exhibit 6, showed that Sarah had various mental health diagnoses, including "[m]ajor depressive disorder, recurrent, moderate"; "[u]nspecified mood [affective] disorder"; "[p]anic disorder"; "[p]ost-traumatic stress disorder, unspecified"; and "[b]ipolar disorder, unspecified."

Sarah testified in her own behalf. She indicated that she regularly took her prescribed medications and had been engaging in therapy. Sarah stated she "never" refused to take Kaliyah to school. However, she would periodically rely on Gail to take Kaliyah to school, pick up groceries, provide physical care, and furnish lodging. Sarah asserted she was not evicted from her apartment in 2024 before the move to Las Vegas. Rather, she left the apartment voluntarily because of issues with mold, condensation, and security. At the time of her testimony, Sarah was unemployed.

A considerable amount of Sarah's testimony centered on her move to Las Vegas. Although she contested the allegations against her, the timeline of events she provided largely matched other witness testimony.

### 3. JUVENILE COURT'S ORDERS

On October 24, 2024, the juvenile court entered two orders. In the first order, the court found that Kaliyah was a child within the meaning of § 43-247(3)(a) and adjudicated her accordingly. The court specifically found that "[t]he allegations in the [p]etition [were] true, and these findings [were] made by a preponderance of the evidence." The court found Kaliyah's testimony was "highly credible," and that "[s]he ha[d] been subjected to endless chaos and ongoing emotional abuse by [Sarah]" and "[was] justified in not feeling safe living with [Sarah]." The court also found Sarah had "on-going mental health needs that hinder[ed] her ability to safely and adequately parent" Kaliyah.

In its second order, the juvenile court found that placement of Kaliyah with Sarah "would be contrary to [her] welfare" and "that reasonable efforts were made, prior to placement, to prevent or eliminate the need for removal and to make it possible for [her] to return to" Sarah's home. The court ordered that temporary legal custody of Kaliyah would remain with DHHS, while her physical custody would remain with Gail. The court also ordered reasonable visitation was "to be determined by DHHS," and that "[f]urther visitation conditions are: [t]herapeutic/supervised for Sarah as arranged by DHHS, provided [Kaliyah] is comfortable participating in parenting time."

Sarah appeals.

### III. ASSIGNMENTS OF ERROR

Sarah assigns, restated and reordered, that the juvenile court erred by (1) issuing the ex parte order for emergency temporary custody; (2) continuing temporary custody of Kaliyah with DHHS during and after the combined protective custody and adjudication proceeding; (3) overruling hearsay and foundation objections to testimony regarding her mental health diagnoses; (4) finding the State proved the allegations set forth in the petition by a preponderance of the evidence; and (5) improperly delegating visitation decisions to DHHS and Kaliyah.

### IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings; however, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Xandria P.*, 311 Neb. 591, 973 N.W.2d 692 (2022).

### V. ANALYSIS

#### 1. EX PARTE ORDER

Sarah asserts several errors regarding the juvenile court's issuance of the ex parte protective custody order. She claims the court (1) "erred by removing Kaliyah from [her] care and custody," (2) "incorrectly found that Kaliyah was seriously endangered in her surroundings and immediate removal was necessary for her protection," and (3) wrongly concluded "that reasonable efforts were attempted to prevent Kaliyah's removal[.]" Brief for appellant at 6.

Any questions relating to Kaliyah's initial removal at the time of the ex parte order in July 2024 were made moot by the juvenile court's issuance of the October 24 order which, after an evidentiary hearing, continued protective custody with DHHS. See *In re Interest of Nathaniel M.*, 289 Neb. 430, 855 N.W.2d 580 (2014) (issue is moot when it seeks to determine question which does not rest upon existing facts or rights, in which issues presented are no longer alive).

#### 2. CONTINUED PLACEMENT WITH DHHS

Sarah next presents several claims relating to the juvenile court's placement of Kaliyah with DHHS, both throughout and after the combined protective custody and adjudication proceeding. Her arguments can be summarized as follows: (1) there was an unreasonable delay between the issuance of the ex parte order and the court's final protective custody order, which violated her constitutional right to the care and custody of Kaliyah; (2) the evidence was insufficient to support Kaliyah's placement with DHHS during the combined proceeding; (3) the evidence was insufficient to support the court's October 24, 2024, protective custody order that found that Kaliyah's out-of-home placement was necessary to protect her safety and welfare; and (4) the State failed to prove reasonable efforts were made to prevent Kaliyah's removal and reunify the family.

##### (a) Timeliness of Protective Custody Order

Sarah first asserts the juvenile court erred by ordering continued out-of-home placement throughout the duration of the combined protective custody and adjudication proceeding. She

specifically argues that "100 days" lapsed between Kaliyah's removal from her care in mid-July 2024, and the court's protective custody order issued on October 24. Brief for appellant at 33. Sarah claims this long duration had a "significant" impact on her constitutional "right to care, custody and companionship of" Kaliyah. *Id.* Sarah also points out the Nebraska Juvenile Code does not permit continued placement pending adjudication unless the State can establish by a preponderance of the evidence at an adversarial hearing that such placement is necessary for the welfare of the juvenile. See *In re Interest of Anthony G.*, 255 Neb. 442, 586 N.W.2d 427 (1998). See, also, Neb. Rev. Stat. § 43-254(3) (Cum. Supp. 2024).

The right of parents to maintain custody of their child is a natural right, subject only to the paramount interest which the public has in the protection of the rights of the child. *In re Interest of Mainor T. & Estela T.*, 267 Neb. 232, 674 N.W.2d 442 (2004). The Nebraska Juvenile Code allows the State to take a juvenile into custody without a warrant or order of the court when it appears the juvenile is "seriously endangered in his or her surroundings and immediate removal appears to be necessary for the juvenile's protection." Neb. Rev. Stat. § 43-248(6) (Cum. Supp. 2024). However, the parent retains a liberty interest in the continuous custody of his or her child. *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018). An ex parte order authorizing temporary custody with DHHS is permitted because of its short duration and the requirement of further action by the State before custody can be continued. *Id.* But the State may not, in exercising its parens patriae interest, unreasonably delay in notifying a parent that the State has taken emergency action regarding that parent's child nor unreasonably delay in providing the parent with a meaningful hearing. *Id.* Therefore, following the issuance of an ex parte order for temporary immediate custody, a prompt detention hearing is required in order to protect the parent against the risk of an erroneous deprivation of his or her parental interests. *Id.* At the detention hearing, the State must prove by a preponderance of the evidence that continuation of the juvenile in his or her home would be contrary to the juvenile's welfare. See *In re Interest of R.G.*, 238 Neb. 405, 470 N.W.2d 780 (1991), *disapproved on other grounds*, *O'Connor v. Kaufman*, 255 Neb. 120, 582 N.W.2d 350 (1998).

Nebraska jurisprudence cautions against unreasonable lapses between the issuance of an ex parte order and a protective custody order. See *id.* It is well-established that such unreasonable delays raise due process concerns which constitute reversible error. See *In re Interest of Carmelo G.*, 296 Neb. 805, 896 N.W.2d 902 (2017) (protective custody order vacated where there was 8-month lapse between issuance of ex parte order for immediate temporary custody and protective custody order). In *In re Interest of R.G., supra*, the Nebraska Supreme Court cautioned that a period of 14 days between the entry of an ex parte order and the protective custody hearing did not violate a parent's due process rights but was "on the brink of unreasonableness." *Id.* at 423, 470 N.W.2d at 792.

In the current matter, the ex parte order for emergency protective custody was entered on July 17, 2024, and a protective custody hearing was set for July 24. At the July 24 hearing, the juvenile court asked Sarah if she was "ready to proceed," but her counsel requested the matter be set "for a more formal hearing," stating, "I don't think we have sufficient time this morning." The court granted the request and said it would "have the attorneys get the date for that hearing." A combined protective custody and adjudication hearing was then set for August 12. On August 9, Sarah's counsel filed an unopposed motion to continue the hearing due to a scheduling conflict. A

hearing on the merits finally commenced on August 30, continued on October 4, and concluded on October 24. As Sarah points out in her brief, around 100 days elapsed between the court's issuance of the ex parte order and its October 24 protective custody order due to the amount of evidence adduced and the several continuances issued because of time limitations.

Despite the delays in this case, we observe that at the beginning of the combined protective custody and adjudication hearing on August 30, 2024, the following exchange took place:

THE COURT: I did meet with counsel in chambers prior to going on the record. I understand that for the sake of efficiency and using the best use of everyone's time that [Sarah] not only wishes to stand by her denial, but have the Court consider potentially addressing the formal hearing on the motion -- on the petition I should say today. Obviously, if the State doesn't prevail on that, then the orders issued after this point in time would be vacated including the temporary custody order. If the State was to prevail, then I'll consider the evidence as well as far as whether reasonable efforts have been made, whether the need for an out-of-home placement continue as part of the evidence presented. That's the Court's understanding as to how the parties want to proceed today. [Counsel], is that a fair summary of where we're at?

[Sarah's counsel]: It is, Your Honor.

Sarah's decisions to initially request a "more formal hearing," then request a continuance due to a scheduling conflict, and finally to combine protective custody and adjudication into a single proceeding are what caused the delays in this case. This ultimately resulted in the lengthy delay between the ex parte order and the protective custody order and Kaliyah's continued placement with DHHS during that time. On appeal, a party cannot complain of error which the party has invited the court to commit. See *In re Interest of Marquee N.*, 30 Neb. App. 862, 974 N.W.2d 26 (2022). Because the delays were attributable to Sarah's decisions, her claim relating to the timeliness of the order fails.

### (b) Continued Placement During Combined Proceeding

Sarah next claims the evidence was insufficient to continue Kaliyah's placement with DHHS during the combined protective custody and adjudication proceeding, specifically after the August 30, 2024, and October 4 hearing dates. However, any issues relating to Kaliyah's placement during the pendency of the combined proceeding are moot because the court's October 24 protective custody order is the current operative directive regarding placement and custody. See *In re Interest of Nathaniel M.*, 289 Neb. 430, 855 N.W.2d 580 (2014).

### (c) Protective Custody Order

Sarah also contends the juvenile court's October 24, 2024, protective custody order was not supported by sufficient evidence.

Section 43-254(3) sets forth the requirements for continuing to withhold a juvenile from his or her parent, and it provides, in part, as follows:

If a juvenile has been removed from his or her parent, guardian, or custodian pursuant to subdivision (6) of section 43-248, the court may enter an order continuing detention or placement upon a written determination that continuation of the juvenile in his or her home

- 10 -

would be contrary to the health, safety, or welfare of such juvenile and that reasonable efforts were made to preserve and reunify the family if required under section 43-283.01.

The State must prove the requirements of § 43-254 by a preponderance of the evidence. *In re Interest of Harley S.*, 32 Neb. App. 707, 4 N.W.3d 886 (2024).

### (i) Contrary to Health, Safety, or Welfare

Upon our de novo review, we conclude that the State proved by a preponderance of the evidence that placement with Sarah would be contrary to Kaliyah's health, safety, or welfare. Specifically, we find that the many arguments between Sarah and Kaliyah, Sarah's failure to provide adequate food, and Kaliyah's lack of school attendance collectively present risks to Kaliyah's health and welfare.

The record shows that Sarah and Kaliyah would repeatedly engage in arguments which often left Kaliyah "angry," "distraught," and scared. According to Kaliyah's testimony, Sarah told Kaliyah she would make her "life a living hell" and blamed Kaliyah for the death of Kalub. This testimony was corroborated by Gail and Stormie, who indicated Sarah would constantly talk down to Kaliyah. These fights were emotionally difficult for Kaliyah. During her testimony, she stated she lost her appetite, stopped eating, and was "miserable" because of the constant arguments. There is also evidence in the record to show Sarah was isolating Kaliyah by blocking communication with friends and family members. This occurred despite the fact Kaliyah had close relationships with Gail and Stormie. According to Vesper, Kaliyah's therapist, this isolation contributed to the development of "depressive type symptoms" and a "sense of hopelessness" in Kaliyah.

There was also evidence which showed Sarah either could not or would not provide adequate food for Kaliyah. According to Vesper, Kaliyah reported that Sarah was not making meals and that "there was little to eat[.]" Gail testified that part of Kaliyah's unhappiness stemmed from "food insecurities." When Kaliyah was asked about food in the home, she stated there were times were "there was barely any food," and her grandmother would have to bring groceries to the home. Further, at the time of the combined proceeding, Sarah did not have a source of income as she had recently quit her job to "work on" herself.

Exhibit 2 demonstrates Kaliyah missed numerous days of school while in Sarah's care. During the eighth grade, Kaliyah had a total of 58.29 "[u]nexcused" absences, and throughout the ninth grade, she had 38.59 "[u]nexcused" absences. Sarah would "refuse[] to get up" and take Kaliyah to school, which led to Kaliyah "falling behind in school" and failing her first period class. Since Kaliyah's removal from Sarah's custody, her grades have improved to "all As and Bs with the exception of math[.]"

Accordingly, based on this evidence, we find placement of Kaliyah with Sarah would be contrary to her health and welfare.

### (ii) Reasonable Efforts

Prior to removing a child from their parental home, Neb. Rev. Stat. § 43-283.01(2) (Cum. Supp. 2024) states, in relevant part, that "reasonable efforts shall be made to preserve and reunify families prior to the placement of a juvenile in foster care to prevent or eliminate the need for removing the juvenile from the juvenile's home and to make it possible for a juvenile to safely

- 11 -

return to the juvenile's home." Section 43-283.01(1) provides that "in determining whether reasonable efforts have been made to preserve and reunify the family and in making such reasonable efforts, the juvenile's health and safety are the paramount concern."

In this case, the State's evidence demonstrated that reasonable efforts had been made to both prevent Kaliyah's removal and reunify her with Sarah. Prior to the juvenile court's involvement, DHHS offered Sarah a co-occurring evaluation to address her mental health and a safety plan whereby Kaliyah would be placed with Gail and Sarah would have fully supervised visitations. While it is true that the terms of the safety plan called for out-of-home placement, testimony from Parker showed that Sarah did not want Kaliyah to return to her home "because it was not a safe environment[.]" The State also elicited testimony which showed Sarah encouraged DHHS to file the affidavit for removal because she wanted a guardian ad litem and attorney appointed to her case. Further, even after Kaliyah was placed in the legal custody of DHHS, Sarah was offered several services to help facilitate reunification, including family support services, transportation assistance, and supervised visitation. Upon our de novo review, we find reasonable efforts were made in this case.

For the foregoing reasons, we find that the juvenile court's October 24, 2024, protective custody order was supported by sufficient evidence.

### 3. ADJUDICATION

Sarah's next two assigned errors relate to the admission and sufficiency of evidence received at the adjudication hearing.

### (a) Evidentiary Objections

Sarah asserts the juvenile court erred by overruling her foundation and hearsay objections to Urwiller's testimony regarding certain mental health diagnoses. Sarah argues she was prejudiced by this testimony "because it was the only evidence the State offered which tended to prove [she] had a mental health condition[.]" Brief for appellant at 31.

The Nebraska Evidence Rules control adduction of evidence at an adjudication hearing under the Nebraska Juvenile Code. *In re Interest of Lilly S. & Vincent S.*, 298 Neb. 306, 903 N.W.2d 651 (2017). See, also, Neb. Rev. Stat. § 43-279(1) (Cum. Supp. 2024). However, in a juvenile case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party. See *In re Interest of Xandria P.*, 311 Neb. 591, 973 N.W.2d 692 (2022). Moreover, in evaluating evidentiary objections, it is important to note that an appellate court does not consider inadmissible evidence in its de novo review of a juvenile proceeding. See *id.*

Even without considering Urwiller's contested statements, there was other evidence to show that Sarah suffered from mental health conditions. We specifically point to Sarah's medical records, which provide a list of several mental health diagnoses. Accordingly, we find unpersuasive Sarah's statement that Urwiller's testimony was "the only evidence" that tended to show she had a mental health condition. Brief for appellant at 31. Therefore, even if the juvenile court erred in admitting Urwiller's testimony, upon our de novo review, we conclude Sarah was not prejudiced.

- 12 -

(b) Sufficiency of Evidence

Sarah claims the juvenile court erred by finding the State proved the allegations in the petition by a preponderance of the evidence and concluding Kaliyah was a child within the meaning of § 43-247(3)(a).

To obtain jurisdiction over a juvenile at the adjudication stage, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247. *In re Interest of Lilly S. & Vincent S, supra*. Section 43-247(3)(a) grants a juvenile court exclusive jurisdiction over any juvenile "who lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian." While the State need not prove that the child has actually suffered physical harm, Nebraska case law is clear that at a minimum, the State must establish that without intervention, there is a definite risk of future harm. *In re Interest of Lilly S. & Vincent S., supra*. The State must prove such allegations by a preponderance of the evidence. *Id.*

We note at the outset that in its adjudication order, the juvenile court generally found "[t]he allegations as set forth in the [p]etition" to be true and that the State met its burden of proof. While the court did make certain findings of fact, it did not identify which specific allegations within the petition it found to be true. However, the broad language of the adjudication order suggests the court found all allegations contained in the State's petition to be supported by competent evidence, and we therefore consider the evidence as to each allegation.

The petition in this case alleged that Sarah (1) failed to provide a safe and stable home and/or adequately care for Kaliyah, (2) was both physically and emotionally abusive toward Kaliyah, (3) had unaddressed or inadequately addressed mental health needs, (4) reported struggling with drug addiction in the past, and that (5) these matters placed Kaliyah at risk of harm. Upon our de novo review, we conclude the State adduced sufficient evidence to prove Sarah failed to provide a safe and stable home and/or provided inadequate care, was emotionally abusive toward Kaliyah, had unaddressed mental health needs, and that these matters placed Kaliyah at risk of harm. However, we do not find sufficient evidence to show that Sarah was physically abusive toward Kaliyah or that Sarah's prior drug addiction placed Kaliyah at a definite risk of future harm.

*(i) Failure to Provide Safe and Stable Home and/or Adequate Care*

Based on witness testimony, Sarah was unable to provide a stable home for Kaliyah. Kaliyah testified that Sarah was evicted twice between the summer of 2023 and May 2024 for failing to pay rent. After the second eviction, Sarah and Kaliyah stayed with a family friend, but this arrangement did not last because Sarah "thought the air was poisonous." They then stayed in a motel for a week before moving to Las Vegas, where Kaliyah was placed in a 2-week hold; she did not return to Sarah after that hold. Urwiller expressed concerns that these frequent changes of residences were "very hard for a teenager emotionally." Vesper indicated the constant moving was negatively impacting Kaliyah's mental health and contributing to her loss of appetite.

The record also reveals Sarah did not provide proper care for Kaliyah. As described previously, the evidence showed Sarah failed to take Kaliyah to school. During her testimony, Kaliyah stated Sarah often "refused to get up" and transport her to school. This caused Kaliyah to "fall[] behind" academically and fail her first period class. School attendance records showed more

than 90 unexcused absences over the course of Kaliya's eighth and ninth grade years. Additionally, as previously noted, Sarah failed to provide adequate food for Kaliyah.

Accordingly, upon our de novo review, we conclude the evidence was sufficient to demonstrate that Sarah failed to provide a safe and stable home and/or provide adequate care for Kaliyah.

### (ii) Emotional Abuse

In our discussion of Kaliyah's continued placement with DHHS, we already examined the evidence relating to the arguments between Sarah and Kaliyah and how they were injurious to Kaliyah's welfare and wellbeing. As noted, several witnesses testified that Sarah would often blame Kaliyah for the death of her brother, which would make Kaliyah feel "distraught" and "miserable." There was also evidence that these fights caused Kaliyah to lose her appetite and stop eating. However, after leaving Sarah's care, Kaliyah has since begun to eat regularly, and her outward demeanor has improved significantly. Accordingly, upon our de novo review, we find there was sufficient evidence to show emotional abuse of Kaliyah and that such abuse placed Kaliyah at a definite risk of future harm.

### (iii) Unaddressed Mental Health Concerns

The record is replete with evidence that Sarah suffers from unaddressed mental health conditions. Testimony from the State's witnesses showed that Sarah often had paranoid thoughts about people stalking her, entering her residence without permission, and "bugging" her devices, which manifested in irrational behaviors. Further, exhibit 6, which Sarah herself offered at the combined proceeding, shows she has been diagnosed with "[m]ajor depressive disorder, recurrent, moderate"; "[u]nspecified mood [affective] disorder"; "[p]anic disorder"; "[p]ost-traumatic stress disorder, unspecified"; and "[b]ipolar disorder, unspecified." Sarah's paranoid thoughts often had adverse effects on Kaliyah. During her testimony, Kaliyah recounted how Sarah took her cell phone away "for weeks" because "she thought somebody hacked" into it. Because of this, Kaliyah was unable to keep in contact with family and friends. Vesper, her therapist, stated this lack of communication caused depression-like symptoms and instilled a sense of hopelessness in Kaliyah. Accordingly, upon our de novo review, we find there was sufficient evidence to prove that Sarah had unaddressed mental health concerns that placed Kaliyah at a definite risk for future harm.

### (iv) Physical Abuse and Previous Drug History

Upon our de novo review, we find the State failed to prove the allegations relating to physical abuse and drug use by a preponderance of the evidence. The only evidence adduced relating to physical abuse came from Kaliyah's testimony wherein she stated Sarah "slapped" her across the face and "pulled" the collar of her shirt after a childhood friend stayed at Sarah's house longer than expected. When asked when this incident occurred, Kaliyah initially responded that she could not recall but stated on cross-examination the event happened when she was in elementary school. Other witnesses, such as Vesper and Parker, testified they were aware of this incident, but it was not "current" and there "wasn't a lot of information" about it. During closing arguments, the State even conceded there "wasn't a lot of evidence on physical abuse[.]" We fail

to see how one isolated slap that occurred several years prior to the filing of the petition proves a pattern of physical abuse that puts Kaliyah at a definite risk of future harm.

Similarly, we conclude there was insufficient evidence to show that Sarah's prior drug addiction placed Kaliyah at a current risk of definite harm. In its petition, the State alleged Sarah had "reported struggling with drug addiction in the past," and these previous reports placed Kaliyah at risk of harm. In her brief, Sarah argues there was "no evidence" that she "struggled with drug addiction during the period leading up to the" filing of the petition. Brief for appellant at 39. While we agree that testimony was elicited which tended to show that Sarah used illegal drugs at earlier points in her life, there was no evidence that showed this past use put Kaliyah at a definite risk of future harm.

The evidence relating to Sarah's drug use is summarized as follows. Gail indicated that Sarah began using methamphetamine at an early age and later had an opioid addiction. When Gail was asked whether Sarah's drug addiction continued into "recent times," she responded that Sarah had "severe weight loss" "a couple of times" but otherwise she had "no proof" of current drug use. When Kaliyah was asked if she ever observed Sarah use "substances," she stated Sarah used medication but did not know about "[d]rugs." Kaliyah testified that she had suspicions that Sarah's friends used illicit drugs. Kaliyah recalled one time during the eighth grade when Sarah had a friend over, and the friend went to the restroom. When Kaliyah entered the restroom after the friend left, she found a "needle on the ground." Kaliyah was also asked if she had ever observed Sarah in an "impaired state." She responded there were times when Sarah would sleep "all day." Sarah's medical records state that Sarah used drugs "in the past[.]"

The evidence recounted above does show that Sarah struggled with drug addiction in the past. However, we agree with Sarah that there was no evidence adduced which showed she used drugs during the time period leading to the State's petition. Any testimony relating to recent drug use was based on mere suspicion and speculation. All the witnesses asked about Sarah's current drug use said they either had no knowledge or "no proof." Even if we were to assume that Sarah did take illegal drugs leading up to the filing of the petition, a parent's illegal activity—without more—is not sufficient to adjudicate a child. *In re Interest of Trenton W.*, 22 Neb. App. 976, 865 N.W.2d 804 (2015). There was no evidentiary nexus which tended to show that any drug use was witnessed by Kaliyah, impacted her in any way, or put her at a definite risk of future harm. Accordingly, upon our de novo review, we find there was insufficient evidence to prove Sarah's previous drug use placed Kaliyah at risk for harm.

Although we find the record insufficient to support the juvenile court's findings relating to physical abuse and Sarah's previous drug use, there was sufficient evidence to prove Sarah failed to provide a safe and stable home and/or provided inadequate care, was emotionally abusive toward Kaliyah, had unaddressed mental health needs, and that these matters placed Kaliyah at risk of harm. We therefore affirm the court's adjudication of Kaliyah under § 43-247(3)(a).

4. DELEGATION OF VISITATION DECISIONS

In her last assignment of error, Sarah claims the juvenile court erred by improperly delegating visitation decisions to DHHS and Kaliyah.

Parental visitation rights, as a subject within the Nebraska Juvenile Code, are matters for judicial determination. *In re Interest of Teela H.*, 3 Neb. App. 604, 529 N.W.2d 134 (1995). The

authority to determine custody and visitation cannot be delegated to a third party, because it is a judicial function. *VanSkiver v. VanSkiver*, 303 Neb. 664, 930 N.W.2d 569 (2019). While the Nebraska Juvenile Code allows a juvenile court to award a child "to the care of [DHHS]," it only permits DHHS to "determine the care, placement, medical services, psychiatric services, training, and expenditures on behalf of each juvenile committed to it." Neb. Rev. Stat. § 43-285(1) (Cum. Supp. 2024). The language of § 43-285(1) does not authorize DHHS or any other third party to determine or place restrictions on parental visitation rights. See *In re Interest of Teela H., supra*.

In the present case, the relevant portion of the juvenile court's protective custody order reads:

Reasonable visitation to be determined by DHHS[.]

Further visitation conditions are:

Therapeutic/supervised for Sarah C[.] as arranged by DHHS, provided the juvenile is comfortable participating in parenting time.

A judgment's meaning is determined, as a matter of law, by the contents of the judgment in question. *Ramaekers v. Creighton University*, 312 Neb. 248, 978 N.W.2d 298 (2022). Unless the language used in a judgment is ambiguous, the effect of the judgment must be declared in the light of the literal meaning of the language used. *Id.* Ambiguity in a judgment exists when a word, phrase, or provision therein has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Id.* These canons of construction apply to final orders as well. See *id.* See, also, *In re Interest of Teela H., supra*.

Based on the language in the juvenile court's protective custody order, we conclude that the plain and unambiguous meaning of that order is that DHHS is to decide whether supervised and/or therapeutic visitation is to occur, and to make arrangements for the same. Kaliyah is also empowered to determine the frequency of her visitation with Sarah based on her comfort level. This interpretation is based upon the language of the order, not upon what the parties believe the court meant but did not say. See *Neujahr v. Neujahr*, 223 Neb. 722, 393 N.W.2d 47 (1986).

We have found orders with similar language to be improper delegations of authority. In *In re Interest of Teela H., supra*, this court concluded the following order was an unlawful delegation of judicial authority: "[V]isitation by the mother of the juvenile [shall] be held in Scottsbluff, Nebraska and shall be supervised by the Department of Social Services as recommended by Dr. Sorrell." *Id.* at 609, 529 N.W.2d at 138 (brackets in original). We determined the plain meaning of that order gave a psychiatrist the authority to determine the "time, manner, and extent" of parental visitation. *Id.* at 611, 529 N.W.2d at 139. We reversed and remanded with directions for the county court, sitting as a juvenile court, "to determine visitation privileges if and when appropriate." *Id.*

Ordering DHHS to decide whether "[t]herapeutic/supervised" visitation is to occur leaves to DHHS the decision of whether visitation should be therapeutic or supervised. While DHHS can certainly make the arrangements for visitation, the juvenile court must provide direction based upon the evidence as to whether that visitation must be therapeutic or supervised. Further, the language that visitation is to occur "provided the juvenile is comfortable participating in parenting time" grants Kaliyah the authority to determine the frequency and extent of Sarah's visitation.

While we appreciate and are cognizant of the court's concern for Kaliyah's comfort level, it, not the juvenile, has the duty to determine whether visitation should occur.

Accordingly, we reverse those portions of the court's protective custody order and remand with directions to determine the nature and extent of visitation.

## VI. CONCLUSION

For foregoing reasons, we find the evidence insufficient to support the juvenile court's findings relating to physical abuse and Sarah's past drug addiction. We further reverse the court's improper delegation of judicial authority regarding visitation and remand the issue with directions for the court to determine the nature and extent of visitation. However, we otherwise affirm the juvenile court's adjudication order and Kaliyah's continued placement with DHHS.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.